**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| **BETH VERMEER,** ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | C.A. No. _____ |
| v. ) | |
| ) | **DEMAND FOR JURY TRIAL** |
| **UNIVERSITY OF DELAWARE,** ) | |
| ) | |
| *Defendant.* ) | |
| _____ ) | |

**<u>COMPLAINT</u>**

Plaintiff Beth Vermeer, Ph.D. ("Vermeer" or "Plaintiff") brings this action against the

University of Delaware ("University" or "Defendant") to seek redress for the violation of her

statutory right to be free of gender discrimination and stereotyping under Title IX, 20 U.S.C. §

1681(a) ("Title IX"), discrimination based on sex and retaliation for protected activity in

violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.* ("Title VII"),

discrimination based on sex and family responsibilities and retaliation for prior protected activity

under the Delaware Discrimination in Employment Act ("DDEA"), DE Code Tit. 19 Sec. 710, *et

seq.*, for violations of the Equal Pay Act of 1963, 29 U.S.C. § 206(d) ("EPA"), and Breach of

Contract for Impermissible escalation of Research Standards, Violation of Academic Freedom,

Breach of Agreement to Extend Contract, and Breach of the Covenant of Good Faith and Fair

Dealing, Vermeer, by and through her undersigned attorneys, avers, on personal knowledge with

respect to her own acts and on information and belief with respect to all other matters, as

follows:

## THE PARTIES

4.      Plaintiff is a resident of the Commonwealth of Pennsylvania.

5.      Defendant is a partially state-funded, privately governed research university located in Newark, Delaware.

## JURISDICTION AND VENUE

6.      This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331.

7.      This Court has supplemental jurisdiction over Vermeer's state law claims pursuant to 28 U.S.C. § 1367.

8.      Venue in this judicial District is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to this lawsuit occurred in this judicial District.

## BACKGROUND FACTS

9.      Vermeer is a Certified Public Accountant (licensed in Maryland) who holds a Ph.D. in Accounting, a Master of Science degree in Accounting / Taxation, and a Bachelor of Science degree in Accounting.

10.      Vermeer earned her Ph.D. in Accounting in or about June of 2013 after thirteen years in public practice as a CPA and tax accountant working in international, regional, and local CPA firms.

11.      Vermeer joined the faculty at the University as a full-time visiting assistant professor in the fall semester of 2013. She was subsequently hired as a tenure track assistant professor beginning in or about the fall semester of 2014 in the Accounting and Management Information Systems Department ("Department") of the Alfred Lerner College of Business and Economics ("College") within the University.

12.      Vermeer was employed by the University as an assistant professor until August of

2

2021. Due to the COVID-19 pandemic students and professors were not on campus during this time. At the University's instruction, Vermeer cleaned out her office and returned the University credit card and keys in August of 2021. Vermeer was compensated until August of 2021 by the University.

13.     In or about 2014, Vermeer volunteered to serve on a Department Hiring Committee and spent considerable time reviewing resumes, arranging interviews, and interviewing candidates for appointment to the Department.

14.     The Hiring Committee ranked the top three candidates during the summer of 2014 and voted on whom to invite to campus.

15.     Dr. Jennifer Joe, Ph.D. ("Joe"), the Whitney Family Professor of Accounting, a member of the Hiring Committee, disagreed with the selections.  Joe persuaded the Department Chair at the time, Dr. Scott Jones, Ph.D. ("Jones"), a professor of Accounting, and Dr. Bruce Weber ("Weber"), Dean of the College, to circumvent the work of the Hiring Committee in order to bring to campus certain candidates whom Joe favored.

16.     Vermeer expressed in emails to Jones in or about August 2014 and subsequently in a Department meeting the view that such actions undermined the work of the Department Hiring Committee and were inconsistent with Department policies and procedures. They were additionally inconsistent with good, shared governance.

17.     Immediately after that meeting, Jones warned Vermeer to keep quiet and not to cause trouble with Joe, a chaired professor, and told Vermeer that she just did not understand "how things are done."

18.     In order to obtain a majority vote to allow the Hiring Committee to bring to campus the candidates that Joe favored and to remove from consideration the three candidates

originally selected by the Hiring Committee, Jones then temporarily added members to the Hiring Committee. In retaliation for Vermeer's exercise of academic freedom in questioning of his and Joe's actions, Jones began to undermine Vermeer's prospects at the University on account of her gender.

19.     For example, in the fall of 2014, when the new candidates came to campus for vetting, Jones accused Vermeer of improperly asking probing questions of a candidate (whom Jones and Joe favored) during the candidate's research presentation.

20.     In a January 2015 meeting scheduled at his request, Jones said to Vermeer: "I've never seen an untenured female faculty member be so aggressive in questioning a candidate during a seminar," and "I find your attitude very unattractive for a woman."

21.     In two additional meetings that took place in or about February and March 2015, Jones declared to Vermeer: "Women of your age usually know their place, but since you don't seem to, let me tell you.  You are not to speak at future seminars or meet with candidates who come to visit.  You are also not to speak in faculty meetings. Period.  You need to keep your mouth shut because no one wants to hear your opinion.  You are an assistant professor, and you cannot voice your opinions or speak up against an endowed chair or me. You will lose."  Jones also declared to Vermeer: "I've decided that you are not going to take over the tax/VITA [Volunteer Income Tax Assistance] Program, and I will not allow you to do any high visibility service for the Department."  Jones then added: "At least your husband still has a good job, so you don't have to worry too much."[1]

22.     Jones began employing harassing, physical intimidation tactics against Vermeer,

---

[1]     Tom Vermeer, Vermeer's husband, is a tenured professor within the Department.  Tom Vermeer is referred to herein as "Dr. Tom Vermeer."

4

including by standing up and leaning over her, pounding his fists, and raising his voice in anger, behavior which intensified over subsequent months.

23.    Jones also told Vermeer that: "I hold the hammer" and "we're going to make sure that you don't get tenure." Jones's threats to undermine Vermeer's tenure prospects were confirmed by a letter sent by Dr. Sheldon Pollack ("Pollack"), one of seven tenured, full faculty in the Department.  Pollack's letter was sent to all 7 tenured, full faculty members in the department, as well as Jones, Associate Dean Rick Andrews ("Andrews"), Weber, Associate Provost Matthew Kinservik ("Kinservik"), and then Provost Domenico Grasso ("Grasso") on July 28, 2015.

24.    Pollack's letter states in part: "Scott [Jones] also made a similar proposal to 'punish' Beth Vermeer for asking critical questions of a candidate that he favored for a position in the [D]epartment. [Jones] proposed barring her from attending any future candidate lectures or meeting with candidates. (I told him that he would be violating her academic freedom, and he seemed to back off with that threat.  Or has he gone ahead with some form of retaliation?)."

25.    On information and belief, Jones made these threats after consultation with, and with the support of Joe and Weber.

26.    Thereafter, Jones took further actions to punish Vermeer in an effort to undermine her tenure prospects and drive her from the University.

27.    Before Vermeer had spoken out on issues relating to the Hiring Committee, Jones had promised her, on numerous occasions, that he would move her to the Department's new office suite after construction was finished.  But after Vermeer questioned Joe's actions in circumventing the work of the Hiring Committee, Jones told Vermeer that he was going to exclude her from the new office suite because he did not like her and also because Joe did not

want Vermeer near her.

28.     In August 2015, Jones carried through on this threat by excluding Vermeer from the newly constructed Department office suite while placing all other untenured accounting faculty there (including those hired after Vermeer).

29.     Jones kept Vermeer in an office between classrooms and removed from all faculty, so that she would not have the benefit of being in the new office suite within close proximity to senior research faculty for relationship development, research synergies, and mentoring.

30.     Jones's retaliatory isolation of Vermeer was so obvious that many faculty members commented on it, which further served to marginalize Vermeer and undermine her prospects for tenure and promotion.

31.     Jones continued to harass Vermeer, contributing to her isolation and abuse, both physically and intellectually, in an effort to bully her into leaving the University.

32.     For example, on or about September 3, 2015, Vermeer received an email from Jones falsely accusing her of making an improper comment to a student who was concerned about why Dr. Tom Vermeer had been removed from teaching his audit class.

33.     Vermeer responded by email to Jones on or about September 4, 2015, with a copy to Weber and former Provost Domenico Grasso.  Vermeer's email denied the false accusation and further stated: "I cherish my job at UD and want to move forward positively but have been made to feel constantly threatened and insecure over the past several months.  I feel like I cannot even engage with my students without fear of harassment and punishment from someone recreating what they believe I said."

34.     Weber met with Vermeer on September 14, 2015, at which time Vermeer

discussed with Weber the abuse, harassment, discrimination, and retaliation that she had endured up to that point.

35.    Vermeer reported to Weber that she believed Jones's abusive and discriminatory behavior was due to Vermeer's being a female who did not exhibit the submissive "attitude" Jones expected of women, and also due to her marital relationship with Dr. Tom Vermeer. In addition, Vermeer asked Weber about her compensation relative to her colleagues because Vermeer had learned that Jones told colleagues that he was happy that Vermeer was "underpaid." Specifically, Vermeer reported that Jones had told colleagues that he and Weber decided to pay Vermeer "under market" because they did not want to pay her more than her husband and that, in retrospect, Jones was happy with that decision given Vermeer's actions in speaking out on Department affairs.

36.    Weber told Vermeer that he understood her concerns and that she was not the only female faculty member to come to him with complaints of abusive and retaliatory behavior by Jones. A colleague shared with Vermeer an email from a female faculty member by the name of Uma Velury ("Velury") who stated in her email to Weber: "There is now a heightened sense of danger and fear of retaliation.  I am starting my week with a sense of despondency and fear, not knowing what this week will bring."  Weber's subsequent advice to Velury was to contact campus public safety.

37.    Weber advised that he was bringing in an outside consultant from Chicago to help with the situation, and Weber asked Vermeer to give him time to work on the problem with the help of the outside consultant, to refrain from filing a formal complaint against Jones, and to try to "press the reset button."

38.    Trusting in Weber's word and his request for patience, Vermeer agreed to wait to

pursue any complaint against Jones. Later, however, Jones and another colleague told Vermeer that, in fact, Weber was "sickened" that he had to meet with Vermeer and wanted her gone from the University.

39.     Further, in April 2016, when the outside consultant was first scheduled to visit the Department, Jones specifically excluded Vermeer from meeting with the outside consultant.

40.     In an email to Matthew Kinservik, Vice Provost and Deputy Title IX Coordinator at the University, Pollack observed: "our chair [Jones] has excluded certain faculty from meeting with the consultant.  In particular, an assistant professor [Vermeer] who has been the target of our chair's wrath has been denied a meeting with the consultant.  This is an obvious attempt to manage the process and minimize the negative comments."

41.     Vermeer was later permitted to meet with the consultant during her second visit with the faculty on or about May 15, 2016.  During this meeting Vermeer again reported the abuse and discrimination she had experienced at the hands of Jones and Weber, and the consultant commented on the isolation of Vermeer's office location.

42.     During this meeting, the consultant also offered to serve as a mediator to facilitate communications between Vermeer and Jones.  Vermeer agreed and expected to participate in such mediation during the next visit from the consultant.  No such mediation ever occurred.

43.     In his annual evaluation of Vermeer in the spring of 2016, Jones again employed unprofessional and harassing intimidation tactics. He stood leaning over Vermeer while she sat and pounded his fists on his desk. Jones also said that he did not like her and again criticized her "attitude," calling her "egotistical" and "narcissistic."

44.     During the evaluation, Jones also criticized Vermeer for copying Weber and Provost Domenico Grasso on her September 4, 2015 email response to him, claiming she did it

"for no reason" and that she had hurt him and Weber.

45.    Due to the September 4, 2015 email, Provost Grasso was reported to have reprimanded Weber for his performance as Dean, in particular for not taking care of the problems in the Department.  Provost Grasso also subsequently denied Jones's reappointment as Department Chair.

46.    At or about that time, Jones told Vermeer that she would not be able to overcome the "uphill battle" regarding tenure that she had allegedly created for herself with him and Weber.  Jones then shared information that Vermeer had disclosed privately to Weber relating to her salary inquiry.

47.    Jones told Vermeer that he and Weber were "on the same side," and advised that they would make sure Vermeer did not get tenure or promotion at the University. In addition, Jones told Vermeer that he, personally, would make sure that she did not win a teaching award at the University as long as he was there despite the fact that Vermeer's teaching metrics were (and are) consistently among the highest in the Department, including both tenured and untenured faculty. In fact, University records confirm that, over time, Vermeer's average ranking has consistently been significantly higher than the Department averages, as summarized here:

|  |  | Q11649 |
|---|---|---|
| Fall 2014 | ACCT Department Average Undergrad | 4.27 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.81** |
| Fall 2014 | ACCT Department Average Undergrad | 4.27 |
| | **Dr. Vermeer Average - ACCT 315 (Intermediate I)** | **4.82** |
| Fall 2015 | ACCT Department Average Undergrad | 4.08 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.78** |
| Fall 2016 | ACCT Department Average Undergrad | 4.30 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.86** |

9

| | | |
|---|---|---|
| Fall 2017 | ACCT Department Average Undergrad | 4.27 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.86** |
| Fall 2018 | ACCT Department Average Undergrad | 4.28 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.56** |
| Fall 2019 | ACCT Department Average Undergrad | 4.36 |
| | **Dr. Vermeer Average - ACCT 413 (Income Tax)** | **4.92** |

48.     After her evaluation meeting with Jones in the spring of 2016, Vermeer decided to avoid being alone with him and move past the harassment and abuse. However, Vermeer subsequently learned from departmental colleagues that Jones was demeaning her.

49.     In response to those reports from colleagues, in early May of 2017, Vermeer first met with Kinservik and reported to him the abuse she had endured under Jones and the hostility of Joe and Weber. Kinservik was, at that time, the Deputy Title IX Coordinator for Faculty and Vice Provost.

50.     Vermeer requested the meeting to report and ask for help relating to the abuse and discrimination and also to ask Kinservik for his advice and assistance in ensuring a fair process toward promotion and tenure given the hostility and sexist attitudes of Jones, Joe, and Weber.

51.     During a follow-up meeting in or about June 2017 with Vermeer, Kinservik suggested that there was nothing that could be done, that a complaint to the Faculty Welfare & Privileges Committee ("FWP") would only increase the animosity toward Vermeer, and that any decision by the FWP Committee would serve no purpose because such a decision, in the form of a recommendation, would be directed to him, Kinservik, and he had already decided that there was nothing that he could do.

52.     In light of the demonstrated hostility of Jones and Joe toward Vermeer, Kinservik also stated that he would talk with Weber about asking Jones and Joe to recuse themselves from participating in Vermeer's promotion and tenure process.

53.     Kinservik also suggested that Vermeer herself ask that Jones and Joe recuse themselves from participating in her promotion and tenure process.

54.     During the time period between Vermeer's first and second meeting with Kinservik, Vermeer again met with the outside consultant who applauded Vermeer's willingness to work through the abuse of Jones and advised that she would return in the coming weeks and over the summer.  However, no further meetings occurred, as Jones refused to participate in any mediation efforts with Vermeer.  The consultant did not return to campus.

55.     Vermeer called Kinservik in or about early July 2017 to make another plea for assistance and to advise him about her additional concerns regarding Jones's and Joe's behavior. Once again, Kinservik advised that there was nothing that could be done.

56.     On or about August 24, 2017, Vermeer sent a final communication to Kinservik, which stated, in part: "[Jones] is continuing to say derogatory things to my colleagues about me and he continues to discuss my salary and other issues with at least a few of my colleagues… I have no idea what to do with all this. It just feels like a nightmare that no one wants to acknowledge, and he and others just keep getting rewarded for their horrible behavior."

57.     Shortly thereafter, on or about October 5, 2017, Weber promoted Jones as Interim Associate Dean, Undergraduate, notwithstanding Provost Grasso's decision not to renew Jones's appointment as Department Chair.

58.     In or about October 2017, Vermeer met with Sue Groff ("Groff"), then the Title IX Coordinator for the University, to report all of her discriminatory and retaliatory experiences

up to that point, and her fruitless efforts to obtain assistance from Weber and Kinservik, and to ask for Groff's help.

59.    Groff advised that Kinservik was "blocking" her and that she wanted to help, but she could not investigate Vermeer's case without authority to circumvent Kinservik. Accordingly, Groff was waiting for approval on a Faculty Senate proposal on a non-discrimination policy that was in-process and would be presented in the spring for a vote.

60.    Groff also advised Vermeer that she believed the Faculty Senate proposal would allow her to investigate the case without Kinservik "blocking" it "from both sides."

61.    When Vermeer next followed up in or about March 2018, Groff stated that she had not forgotten and asked Vermeer to follow up again in May or early summer 2018 when Groff expected to have the non-discrimination policy she needed from the Faculty Senate to pursue the investigation.

62.    When Vermeer followed up again in June 2018, Groff had left the position of Title IX Coordinator for the University.

63.    Joe, Jones, Weber, and others exhibited discriminatory, stereotypical attitudes toward Vermeer due to her gender and family relationships, which confirmed their resolve to deny her tenure.

64.    Joe, Jones, Weber, and other faculty members made numerous stereotypical and/or condescending comments to or about Vermeer betraying their view that, in their eyes, Vermeer could not possibly be considered a serious scholar given her responsibilities as an engaged mother of four daughters.

65.    For example, Joe told Vermeer soon after meeting her that Vermeer needed a full-time nanny if she wanted to be taken seriously.

66.     When Vermeer brought in brownies for the office, in or about fall of 2018, Dr. Carolyn Levine ("Levine"), the new department chair, commented sarcastically that she (Levine) did not have time to bake because she had a "real job" and "didn't have time for that nonsense."

67.     On at least three occasions Jones physically stood and leaned toward and/or over Vermeer while she was standing or seated, and Jones also made repeated discriminatory comments to Vermeer, such as that Vermeer's husband was the "major breadwinner," that Vermeer could always "fall back" on her husband having a good job, and that her role as a mother of four daughters made her career inferior.

68.     University policy requires that "Faculty candidates for promotion and/or tenure will be evaluated based on the criteria in their department's approved promotion and tenure guidelines."  (Faculty Handbook Section 4.4.1).  "Those faculty who are candidates for promotion and/or tenure . . . have the right to be reviewed under the policy and procedure in force at the time of hiring, rather than under any revised policy or procedure subsequently adopted."  (Faculty Handbook Section 4.4.13).

69.     Vermeer thus had the right and chose to be evaluated under the standards set forth in the Department's 2006 Promotion and Tenure Procedures & Criteria ("2006 P&T Standards").

70.     The standard for research excellence for promotion to associate professor, as defined in the 2006 P&T Standards, is as follows:

> To be rated as excellent in research, a candidate must have established a respected, quality research program.  This program should be evidenced by publications in recognized quality and highly regarded refereed journals.  The candidate's research should have received favorable review by recognized scholars from other Universities and provide unmistakable promise of continuing scholarly productivity.

71.     On or about March 18, 2016, the Department's Promotion and Tenure Committee

("P&T Committee") issued to Vermeer a two-year renewal letter confirming that she was making progress toward tenure and that her contract with the University would be renewed for an additional two years within the six-year tenure track program.

72.    The Department's P&T Committee reported that Vermeer was making "good progress in the area of research/scholarly contribution."

73.    The 2016 Letter noted that Vermeer had published three articles in "refereed journals" and that she had several other projects "in progress," including three targeted for submission to "high quality, refereed journals this spring or summer."  This evaluation indicated that Vermeer was making progress consistent with the research standard set forth in the 2006 P&T Standards.

74.    During the timeframe between Vermeer's two-and four-year letters, Joe undertook to revise the Department's research standard.  Thereafter a new, higher research standard was introduced by a committee led by Joe in 2017, and ultimately approved by the Provost in May 2018.

75.    Contrary to the Faculty Handbook, and prior to the Provost's approval of the new research standard, the Department P&T Committee, chaired by Joe, improperly escalated the research standard applicable to Vermeer in connection with Vermeer's four-year renewal letter.

76.    On or about February 9, 2018, the P&T Committee issued to Vermeer a four-year renewal letter that raised the bar significantly over the research standard set forth in the 2006 P&T Standards, as reflected in the four-year renewal letter.

77.    Contrary to the 2006 P&T Standards, which called for publications in "quality and highly regarded refereed journals," the four-year renewal letter "strongly advise[d] Dr. Vermeer to submit her working papers for review and to make concerted efforts to achieve publications in

14

*premier and premier-plus journals*." (Emphasis added).

78.    Thus, the P&T Committee replaced the standard under which Vermeer was "making good progress in the area of research/scholarly contribution" by publishing in "refereed" and "high quality, refereed" journals (two-year letter), with a higher standard under which she was admonished regarding a new requirement "to achieve publications in premier and premier-plus journals" (four-year letter).

79.    The language in the four-year letter is consistent with the standards created in the 2017 P&T Standards ("2017 P&T Standards") that were finalized just prior to Vermeer's four-year renewal letter.[2]

80.    Upon receipt of her four-year renewal letter, Vermeer questioned two faculty members who were on the P&T Committee about the improper insertion of the "premier" wording in the letter.

81.    These colleagues told Vermeer not to worry about it – that the objectionable portions were "Dr. Joe's words" and not theirs. They added that the P&T Committee just wanted Vermeer to get her Journal of the American Tax Association ("JATA") article published so that she would be in excellent shape for tenure and promotion.

82.    Joe also attempted to persuade the P&T Committee to deny renewal of Vermeer's contract at the four-year renewal.  Three fellow colleagues informed Vermeer that Joe did not have the support to deny Vermeer's contract renewal.

83.    Vermeer was further advised by her colleagues not to create any unnecessary waves or to ask that the P&T Committee reconvene and correct the letter by removing the

---

[2]    While the 2017 P&T Standards state "Approved: April 2017," Jones, then Department Chair, reported on May 22, 2018, that Provost Morgan gave final approval to the 2017 P&T Standards on or about May 21, 2018, shortly after being appointed Provost.

escalated "premier" standard.

84.    Joe proceeded to insert the unauthorized "premier" standard into Vermeer's four-year renewal letter so that Joe and the Department P&T Committee could later use this language against Vermeer to defeat Vermeer's application for tenure and promotion.

85.    In or about May 2019, at the start of her promotion and tenure process, Vermeer met separately with the Deputy Dean and the Senior Associate Dean of Faculty and requested that Weber advise Jones and Joe to recuse themselves from Vermeer's P&T process.

86.    Weber later acknowledged to Vermeer that he chose to ignore her request.

87.    The research standards that govern the review of an application for promotion and tenure, as set forth in the Department's 2006 P&T Standards and the Faculty Handbook, place great weight on both the applicant's research publications and on external letters from expert reviewers in the applicant's field.  Vermeer's application demonstrated that she met the applicable research standard in both respects.

88.    With regard to her research publications, Vermeer's application demonstrated that she had met the 2006 P&T Standards in that she had established "a respected, quality research program" as "evidenced by publications in recognized quality and highly regarded refereed journals."

89.    Vermeer provided evidence of eight published or accepted and forthcoming publications.

90.    The Department's Journal List specifically defines "Respected" journals, tying to the 2006 P&T Standards' requirement of "a respected, quality research program", and further defines "Top Tier" journals as one level above the "Respected" standard.

91.    Vermeer provided evidence that she had three publications in "Top Tier" journals,

thus exceeding the "Respected" standard defined in the 2006 P&T Standards.

92.    Vermeer also provided evidence that she had two publications in "Respected"

journals, at least equaling the "Respected" standard in the 2006 P&T Standards.

93.    Thus, Vermeer presented a record with five publications that specifically met or

exceeded the language of the 2006 P&T Standards.

94.    To demonstrate her research quality beyond the Department Journal List,

Vermeer also provided multiple converging external sources of publication quality:

a)    Vermeer provided evidence that her three "Top Tier" publications, as defined by
the Department Journal List, are also deemed to be three "highly regarded"
journal publications as rated by The Association of Business Schools, tying
additionally to the "highly regarded" wording of the 2006 P&T Standards;

b)    Vermeer's publication in *Auditing* is significant, as *Auditing* is considered a
premier accounting publication (the highest distinction possible) as defined by the
Australian Business Deans Council and as the 2nd and 4th most prominent journal
in the audit citation area by Chan *et al.* (2009) and Herron and Hall (2004),
respectively.  In addition, the SJR[3] impact factor is 1.960, ranking *Auditing* as the
6th most prominent and impactful journal in accounting;

c)    Vermeer's publication in *JATA* is significant, in that *JATA* is a premier tax
publication as evidenced by *JATA*'s rank as the 1st, 4th, and 1st most prominent
journal in the tax citation area by Chan *et al.* (2009), Herron and Hall (2004), and
Lowensohn and Samelson (2006), respectively. In addition, the SJR impact factor
is 1.194, ranking *JATA* as the 9th most prominent and impactful journal in
accounting; and

d)    Vermeer's publication in *Journal of Accounting and Public Policy* ("*JAPP*") is
significant, as *JAPP* is a Top 15 accounting publication as evidenced by *JAPP*'s
SJR impact factor of 0.645, which ranks *JAPP* as the 14th most prominent and
impactful journal in accounting.

95.    Vermeer provided evidence of three papers under review, with one paper at

---

[3]    The Scientific Journal Rank ("SJR") indicator is a measure of the scientific influence of
scholarly journals that accounts for both the number of citations received by a journal and the
importance or prestige of the journals where the citations come from. Higher SJR values are
meant to indicate greater journal prestige.

advanced review at *JATA*, a "Top Tier" journal and the premier tax-specific publication journal, as well as seven (7) additional working papers and twelve (12) published conference proceedings.

96.    Vermeer also provided evidence of the award of one high impact competitive grant from the Governmental Accounting Standards Board ("GASB"), the standard setting body and source of generally accepted accounting principles ("GAAP") for over 90,000 governmental entities in the United States.

97.    Vermeer also included a Letter of Impact from Dean Mean, Senior Research Manager for the GASB, discussing her grant and the significance and professional impact of three of her research projects.

98.    Vermeer's application also noted that she received a 2019 Scholarship Excellence Award from Department Chair Levine in May 2019.

99.    As called for by the 2006 P&T Standards, Vermeer's "respected, quality research program" was confirmed by "favorable review by recognized scholars from other Universities", chosen independently by the P&T Committee, and "provide[d] unmistakable promise of continuing scholarly productivity."  This was despite the efforts of Joe and Jones to undermine Vermeer's application with regard to external reviews.

100.    Jones and Joe participated in the selection of Dr. Vermeer's external reviewers, participated in the Department P&T Committee discussions, and voted on her tenure and promotion application, all despite Vermeer's request that they recuse themselves.

101.    At a professional conference in summer 2019, during the period after the selection of Vermeer's external reviewers and before the receipt of the requested letters, Joe improperly attempted to convince one of the external reviewers on Vermeer's list that Vermeer did not meet

the Department's P&T standards.  Nevertheless, the experts that Jones and Joe had a hand in selecting unanimously wrote in favor of Vermeer's research program and for Vermeer to get promotion and tenure.

102.    Three senior accounting faculty in the Department who had full access to the external letters received in connection with Vermeer's P&T process and who wrote in support of Vermeer, noted "that all six of her external reviews were positive." They offered the following summary comments from each reviewer:

a.    **Reviewer 1**: "In summary, I fully support Professor Vermeer's appointment to Associate Professor with tenure based on the quality, breadth, and productivity of her research record. In my view, the University of Delaware is fortunate to have Professor Vermeer on faculty."

b.    **Reviewer 2**: "Professor Vermeer has demonstrated an ability to work on interesting and impactful research questions, to obtain unique data, and to develop innovative research methods. Her papers have contributed to the literature and given her pipeline, I expect her to continue contributing for the next several years."

c.    **Reviewer 3**: "In summary, the evidence that I have examined indicates that Professor Vermeer has a strong scholarly record, and more importantly, that her research productivity will continue given her pipeline of current submissions and working papers."

d.    **Reviewer 4**: "Overall, I feel that Professor Vermeer's research makes a significant contribution to the literature, and that it is of high quality. Her work provides insights into several dimensions including most notably, the influences on tax advisors in their recommendations around tax aggressiveness (a very important topic to tax scholars and practitioners) and the role of auditing and related reporting on municipalities and in particular the relation between municipalities and their bondholders. Her recent papers under review and under current development suggest that she will continue to contribute to the accounting literature in significant ways. Thus, I conclude that her accomplishments and qualifications to date have been outstanding and I do not hesitate to recommend her for promotion to Associate Professor with tenure."

e.    **Reviewer 5**: "In summary, Professor Vermeer has published a

respectable body of interesting and useful work in the governmental and behavioral taxation areas. Both the quality and quantity of her scholarship compare favorably with scholars recently tenured in her field. I am impressed by her enthusiasm and devotion to scholarship."

f.   **Reviewer 6**: "The above data suggest that Professor Vermeer's research record compares favorably to faculty promoted to associate professor at schools similar to the University of Delaware after controlling for the number of years since PhD graduation. My overall opinion is that Professor Vermeer's research productivity compares favorably to her peers in terms of both quality and quantity. I find her research to be insightful, innovative, impactful and clearly communicated. Additionally, she appears to have an active pipeline of working papers, suggesting that she will continue to be a productive scholar."

103.   Despite Vermeer's "respected, quality research program," on September 16, 2019, Jones and Joe cast deciding votes denying Vermeer promotion and tenure in the initial vote of the combined Accounting / MIS Department P&T Committee.

104.   As the prior Department Chair (Jones) and prior Chair of the Department P&T Committee (Joe), Joe and Jones heavily influenced the discussions of Vermeer's research, the disregard of the external review letters, and the P&T Committee's vote.

105.   The Department P&T Committee vote was six (6) in favor, seven (7) opposed, and not counting the three (3) senior accounting faculty who could not attend the meeting (but were entitled to vote) at which the vote took place but who supplied the letter in favor of Dr. Vermeer, discussed above.  There was also at least one other irregularity in that one member of the P&T Committee, Dr. Jinwei Cho ("Cho"), was needed for a quorum and had to attend via telephone. Cho was not capable of casting an anonymous vote in favor of Vermeer because she attended the meeting via telephone, and because of Joe's and Jones's influence and her inability to be anonymous, she felt pressured to vote against Vermeer.

106.   Even though the 2006 P&T Standards and the Faculty Handbook place great

weight on the external letters from expert reviewers in the applicant's field,[4] the letter from the Department P&T Committee conveying the decision recommending a denial of tenure on grounds of lack of research excellence contained not one quotation from those letters and referred to them only in passing. Instead, the letter referred to "Dr. Joe's words" in the four-year renewal letter introducing a "premier or premier plus" research standard contrary to the 2006 P&T Standards that the University was contractually bound to apply in evaluating Vermeer's application for tenure.

107. The Department P&T Committee's initial denial letter also acknowledged that the P&T Committee had escalated the standards set forth in the 2006 P&T Standards through the four-year renewal letter. After setting forth the applicable 2006 standard, the denial letter stated: "***Additionally***, in her 4-year letter she was advised to achieve publications in premier and premier plus journals."

108. By this necessary "addition" to the research standard in the 2006 P&T Standards, the P&T Committee conceded that the 2006 P&T Standards did not require publication in premier and premier plus journals.

109. Despite having awarded Vermeer a "Scholarship Excellence Award" in May 2019, in October 2019, Department Chair Levine joined Joe, Jones, and Weber in conspiring to deny Vermeer tenure by denying her initial appeal on the ground that Vermeer allegedly had not achieved "research excellence."

---

[4]      For example, the Faculty Handbook, at Section 4.4.12, states that "[t]he purpose of obtaining letters from external reviewers is to assess the quality of the candidate's work in their field" and that "[s]olicited external evaluations serve as a major indicator of an individual's impact on the profession and are always required for promotion." By way of comparison, multiple quotes were provided for two male accounting candidates in their letters from the same committee evaluated at the same time for tenure - Dr. Jung (17 quotes) and Dr. Yehuda (7-10 quotes).

110. Levine's letter, dated October 21, 2019, is replete with falsehoods and biased mischaracterizations.

111. <u>First</u>, even though the Department's Journal List demonstrates that the quality of Vermeer's research publications compared equally to that of Dr. Tom Vermeer, who earned tenure in 2012, and was better than that of Dr. Dave Jenkins, who earned tenure in 2008, Levine falsely stated that Vermeer's overall research record was "weaker than every other candidate that was tenured between 2008 and 2016."

112. <u>Second</u>, despite the fact that all six of the external reviewers, chosen independently by the Department P&T Committee to evaluate Vermeer's research record objectively as experts in her field, unanimously stated that Vermeer met or exceeded the 2006 P&T research standards of "a respected, quality research program" as "evidenced by publications in recognized quality and highly regarded refereed journals," Levine falsely stated that none of Vermeer's papers appear in a "highly regarded" outlet, concluding that "highly regarded" journals only equate to the top six journals in accounting.

113. In fact, The Association of Business Schools Ratings rate *three* of Dr. Vermeer's publications in journals that are "highly regarded," matching the 2006 P&T Standards and directly contradicting Dr. Levine's assertions.

114. <u>Third</u>, despite her admittedly "cursory review of the literature," and her lack of expertise in the topical areas in which Vermeer publishes, Levine disregarded the expert market comparisons of the external reviewers and created her own "market" comparison.

115. In later stages of the P&T process, two committees comprised of respected, objective faculty members voted decisively in favor of promotion and tenure for Vermeer based on the record regarding her research program.

116.    On or about December 4, 2019, the Committee on Promotion & Tenure within the Lerner College (the "College P&T Committee"), determined by a 6-3 vote that Vermeer had met the requirements for tenure, contrary to an adverse prior decision of Department Chair Levine.

117.    In a letter dated January 2, 2020, Weber, in order to carry out the plan to punish Vermeer by defeating her tenure application, rejected the conclusion of the College P&T Committee. Weber also resorted to escalating the proper research standard, writing that Vermeer had "no publications in undisputed top-tier journals" and, thus, her research is "not excellent."

118.    This statement was contrary to the 2006 P&T Standards, which state that "[t]o be rated as excellent in research, a candidate must have established a respected, quality research program" and nowhere requires publications in "undisputed top-tier journals." Moreover, the statement that Vermeer had no publications in top tier journals was demonstrably false.

119.    In her appeal letter to Weber dated January 7, 2020, seeking reconsideration of his decision dated January 2, 2020, Vermeer provided evidence that she in fact had *three* Top-Tier journal publications, as referenced by the Department Journal List.

120.    In his post-appeal letter dated January 24, 2020, Weber then escalated the standard he used to evaluate Vermeer to require premier (top 6) publications on the Department Journal List rather than the Top Tier standard he used in his January 2, 2020 letter.

121.    Weber's assertion that Vermeer needed publications in the premier (top six) journals in accounting to meet the standard for research excellence in the governing 2006 P&T Standards was contradicted by evidence from two male accounting colleagues of Vermeer's.

122.    Both Dr. Dave Jenkins (2008) and Dr. Tom Vermeer (2012) went up for tenure and promotion under the 2006 P&T standards and, while neither Dr. Jenkins nor Dr. Tom Vermeer had a premier (top six) publication, both earned tenure and promotion under the 2006

P&T Standards.  Further, back in 2012, Weber personally had evaluated Dr. Tom Vermeer, who earned tenure under the 2006 P&T research standards.

123.    In that positive recommendation, Weber concluded that Dr. Tom Vermeer's publication in *Auditing* was ranked in the ***top five accounting journals.*** Weber then assessed that this level of publication provided evidence of research excellence for Dr. Tom Vermeer under the 2006 P&T standards.  However, when it came time for Weber to evaluate Dr. Tom Vermeer's wife (the Plaintiff), Weber stated in his post appeal letter, dated January 24, 2020, that Vermeer's publication in *Auditing* (the exact same journal) is *not* top-tier and does *not* provide evidence of research excellence under the same 2006 P&T standards.

124.    On or about February 14, 2020, the University P&T Committee (one level up from the College P&T Committee) unanimously overturned Weber's denial and voted in favor of tenure and promotion for Vermeer.[5]  In so doing, the University P&T Committee applied the standard of research excellence in the 2006 P&T Standards.

125.    Finding that Weber had failed to apply that proper standard, the University P&T Committee concluded:

> In our judgment, it is unfair and improper to possess official guidelines and then, at the moment of evaluation, base a judgment on a much more specific set of criteria that were not made available to the candidate during much of the course of her probationary period. We in effect agree with the candidate that the "goalposts" were unfairly moved. It could be argued that the moving goalposts were in addition never made visible enough to tell where they were at any point.
>
> By the formal promotion criteria we believe Dr. Vermeer has met the relevant published scholarly standards. This impression is bolstered by the unanimous and highly positive external reviews. We therefore concur with the Lerner College of Business and

---

[5]    The vote of the Committee was five (5) in favor of tenure, none (0) opposed, one (1) absent, and one (1) required abstention.

Economics Promotion and Tenure Committee's judgment and
recommend her for promotion to Associate Professor with tenure.

126.    The University's P&T Committee's unanimous recommendation then went to

Provost Morgan's office, where, on information and belief, Morgan and Kinservik sought to

carry out Weber's, Joe's, and Jones's plan to punish and discriminate against Vermeer by

denying her tenure, as aided and abetted by Levine.

127.    In a brief letter with no analysis, dated March 13, 2020, Provost Morgan simply

rejected the unanimous conclusions of the University P&T Committee and ignored its concern

about the improper "moving of the goal posts" with respect to Vermeer's research standard.

128.    On or about March 20, 2020, Vermeer filed an appeal of the Provost's initial

denial letter, continuing the P&T process set forth in the Faculty Handbook.

129.    An appeal meeting was scheduled for April 15, 2020, at which time Vermeer met

remotely via Zoom with Provost Morgan.  During that meeting, Vermeer reported to Morgan the

abuse, discrimination, and retaliation she had experienced both during her time at the University

generally, and specifically as it related to her tenure application.  Vermeer highlighted the abuse

she suffered under Jones, the retaliation and gender discrimination in Weber's evaluation as

compared to the two male faculty, and Weber's inconsistent evaluation of publications in

*Auditing* with respect to her as compared with a male colleague and close comparator.

130.    In her appeal letter and during her appeal meeting, Vermeer discussed Weber's

retaliatory intentions, and Joe's improper conduct in interacting with one of Vermeer's external

reviewers in summer 2019 (where she tried to convince one of the external reviewers – while

they were writing their letter – that Vermeer did not meet the P&T standards at the University),

as well as her previous retaliatory acts towards Vermeer.

131.    After the appeal meeting with Morgan, Vermeer sent an email to Morgan

containing copies of the PowerPoint presentation materials Vermeer used during the meeting. The materials outlined the abuse, discrimination, and retaliation Vermeer experienced throughout her employment at the University and during the tenure evaluation process, as well as her thwarted efforts in seeking assistance regarding the same. Morgan requested the PowerPoints and confirmed receipt of the email containing the materials.

132.    On or about April 30, 2020, Morgan, relying heavily on the determinations of Weber and Levine, denied Vermeer's final appeal regarding promotion and tenure. Morgan failed to apply the 2006 P&T Standards and applied an improperly escalated standard.

133.    Morgan also failed to investigate or address the abuse, retaliation, and discrimination that Vermeer reported to her directly during her appeal meeting on or about April 15, 2020, either at that time or at any time thereafter.

134.    Morgan also provided no explanation or reasoning for why she disagreed with the University P&T Committee, the College P&T Committee, or the six independent, external review letters.

135.    On or about March 24, 2020, while Vermeer's appeal in her P&T process was pending, Morgan issued a University-wide announcement stating that "all probationary [tenure track] faculty (*i.e.*, all who are in their first 6 years) are granted a one-year extension to the tenure/contract clock."  At that time, Vermeer was still pursuing her application for promotion and tenure within the University's promotion and tenure process.  She was a probationary tenure track faculty in her sixth contract year through August 31, 2020.  All tenure-track professors receive an additional probationary year (called the terminal year) if tenure is not approved, so this would mean that without the one-year extension detailed above, Vermeer's contract would expire on August 31, 2021. With the one-year extension granted to all other similarly-situated

faculty because of the COVID-19 pandemic, Vermeer's contract should have expired on August 31, 2022.

136.    Morgan's announcement should have entitled Vermeer to an additional year under the University-wide policy.

137.    Nevertheless, after denying Vermeer's appeal on April 30, 2020, Morgan refused to respond to requests for confirmation that the University-wide extension applied to Vermeer, as supported by the University's chapter of the American Association of University Professors.

138.    Instead, on September 23, 2020, the University sent Vermeer notice that her employment would be terminated on August 31, 2021, without granting her the additional year that Morgan promised in the March 24, 2020 announcement, thereby violating its contractual obligations to Vermeer.

139.    Vermeer made a final appeal for assistance to the University's FWP Committee, seeking a ruling that Morgan improperly escalated the 2006 P&T Standards. Prior to the hearing on the matter, which was limited to the single issue of escalation of research standards, the composition of the FWP hearing panel ("Hearing Panel") was altered.

140.    Among other things, a faculty member who, on information and belief, serves at the pleasure of Morgan in a prominent administrative position as the director of a research center and therefore could not have been neutral in deciding a complaint against Morgan, was appointed chair of the Hearing Panel.

141.    At the hearing on or about October 23, 2020, the chair of the Hearing Panel – in a stunning display lacking even the appearance of objectivity - took the lead in calling Morgan as a witness, in advocating on her behalf, and in cross-examining Vermeer.

142.    Morgan testified that her decision to deny Vermeer's tenure application was due

in large part to her perception of the external review letters being "lukewarm." This testimony was contrary to the quotations from the letters that other faculty members and the other committees had provided as evidence that the reviewers' support was unanimous and non-equivocal.

143.    Morgan refused to produce the letters to the Hearing Committee or to identify any specific content from the letters that would support her testimony as to the content of the letters. Nor did the Hearing Panel require Morgan to produce any portions of the letters that she testified she relied on in rejecting the unanimous decision of the University P&T Committee in favor of Vermeer's tenure application. Further, when asked about the documentation provided to her by Vermeer relating to hostility toward Vermeer within the Department, Morgan acknowledged that she failed to take any action to investigate or rectify the discriminatory behavior of Jones, Joe, Weber, Levine, and/or Kinservik.

144.    Morgan testified that it was not her job to investigate the matter, and the Hearing Panel issued its Advisory Opinion to University President Dennis Assanis on November 30, 2020. The Opinion, which on information and belief was drafted by the chair of the Hearing Panel, concluded that Vermeer did not meet her burden of proof demonstrating that Morgan improperly escalated the 2006 P&T Standards.

145.    In support of its conclusion, the Advisory Opinion cited to Morgan's testimony that her decision was based on an alleged lack of "impact" and an alleged lack of "aspiration for excellence," echoing the discriminatory and sexist falsehood that an engaged mother of four could not be a "serious scholar."

146.    The Opinion claimed that such criteria were consistent with the minimum standards for promotion to Associate Professor, as set forth in the Faculty Handbook, 4.4.3.1,

despite the fact that such criteria are not set forth in the cited provision or in the 2006 P&T

Standards that governed Vermeer's application.

147.    Significantly, the criterion of "impact" that Morgan and the Opinion relied on

appears only in the *2017 P&T Standards* – the same escalated standards that the University

improperly applied throughout the process to deny Vermeer's tenure application.[6]

148.    On January 6, 2021, Vermeer filed a timely charge of discrimination with the

Delaware Department of Labor.

149.    On February 5, 2021, President Assanis issued a one-page letter adopting the

position that the research standards had not been escalated.

150.    As the result of Defendant's illegal actions Plaintiff has sustained economic and

mental anguish damages, and she will continue to sustain damages into the future.

151.    On July 28, 2021, The Delaware Department of Labor issued a Right to Sue letter

to Vermeer.

152.    On September 9, 2021, The United Stated Department of Justice issued a Federal

Right to Sue letter to Vermeer.

**COUNT I**
**Discrimination Based on Sex**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2, *et seq*.**

153.    Vermeer hereby incorporates the allegations set forth in the foregoing paragraphs

as though fully alleged herein.

---

[6]    The 2017 P&T Standards state, "To be rated as excellent in scholarship, a candidate must
have established an impactful research program." Morgan did not address documentation
provided to her demonstrating that Dr. Vermeer's research has in fact been impactful.

154.    Vermeer is an "employee" as defined in 42 U.S.C. § 2000e(f).

155.    Defendant is an "employer" as defined by 42 U.S.C. § 2000e(b).

156.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it denied her tenure on March 13, 2020.

157.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it paid Vermeer's male colleagues, in similarly situated positions, more than what it paid her.

158.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it terminated her employment on September 23, 2020, effective August 31, 2021.

159.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful sex discrimination.

160.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

### COUNT II
**Retaliation**
**Title VII of the Civil Rights Act of 1964**
**42 U.S.C. § 2000e-2, *et seq*.**

161.    Vermeer hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

162.    Vermeer is an "employee" as defined in 42 U.S.C. § 2000e(f).

163.    Defendant is an "employer" as defined by 42 U.S.C. § 2000e(b).

164.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it denied her tenure on March 13, 2020.

165.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it paid Vermeer's male colleagues, in similarly situated positions, more than what it

paid her.

166.    Defendant violated Title VII by discriminating against Vermeer, based on her sex, when it terminated her employment on September 23, 2020, effective August 31, 2021.

167.    Vermeer engaged in protected activity under Title VII when on September 4, 2015, she disclosed to Jones, Weber, and Grasso the harassment and discrimination that she faced.

168.     Vermeer engaged in protected activity under Title VII when she met with Weber on September 14, 2015 to discuss the abuse, harassment, discrimination, and retaliation she was facing from Jones. Weber proceeded inappropriately to share this protected activity with Jones, who was the source of the abuse, harassment, discrimination, and retaliation.

169.     Vermeer engaged in protected activity under Title VII when she met with an outside consultant on May 15, 2016 to discuss the abuse, harassment, discrimination, and retaliation that she was facing in her department.

170.    Vermeer engaged in protected activity under Title VII when she met with Deputy Title IX Coordinator for Faculty at the time, Kinservik, in May and June of 2017 to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

171.    Vermeer engaged in protected activity under Title VII when in between her meetings with Kinservik, she again met with the outside consultant to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

172.    Vermeer engaged in protected activity under Title VII when she spoke with Kinservik again in July of 2017 to beg him to assist with the abuse, discrimination, harassment, and retaliation she was facing in her department.

173.    Vermeer engaged in protected activity under Title VII when she emailed

Kinservik on August 24, 2017 to ask him, again, for help regarding the abuse, harassment, discrimination, and retaliation that she was facing in her department.

174.    Vermeer engaged in protected activity under Title VII in October 2017, when Vermeer met with Groff, then the Title IX Coordinator for the University, to report all her discriminatory and retaliatory experiences up to that point.

175.    Vermeer engaged in protected activity under Title VII when in March of 2018 she communicated with Groff again to follow up on her reports of discriminatory and retaliatory experiences up to that point.

176.    Vermeer engaged in protected activity under Title VII when in May of 2019 she asked Weber to have Joe and Jones recuse themselves from her promotion and tenure process.

177.    Vermeer engaged in protected activity under Title VII when she submitted an appeal letter to Weber on January 7, 2020, detailing the discriminatory and retaliatory experiences she had faced up to that point.

178.    Vermeer engaged in protected activity under Title VII when in March of 2020 she submitted an appeal letter to Morgan detailing the discriminatory and retaliatory experiences she had faced up to that point.

179.    Vermeer engaged in protected activity under Title VII on April 15, 2020, when Vermeer advised Morgan about the abuse, discrimination, and retaliation she had experienced both during her time at the University generally, and specifically as it related to her tenure application.

180.    Vermeer engaged in protected activity under Title VII when she followed up on her meeting with Morgan by sending all the materials used for her presentation, detailing the discriminatory and retaliatory behaviors that she had faced up to that point.

181.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful retaliation.

182.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

**COUNT III**
**Discrimination Based on Sex**
**Delaware Discrimination in Employment Act**
**DE Code Tit. 19 § 710, *et seq*.**

183.    Vermeer hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

184.    Vermeer is an "employee" as defined in DE Code Tit. 19 § 710(6).

185.    Defendant is an "employer" as defined by DE Code Tit. 19 § 710(7).

186.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it denied her tenure on March 13, 2020.

187.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it paid male colleagues, in similarly situated positions, more than what it paid her.

188.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it terminated her employment on September 23, 2020, effective August 31, 2021.

189.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful sex discrimination.

190.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

<u>COUNT IV</u>
**Retaliation**
**Delaware Discrimination in Employment Act**
**DE Code Tit. 19 § 710, *et seq*.**

191.    Vermeer hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

192.    Vermeer is an "employee" as defined in DE Code Tit. 19 § 710(6).

193.    Defendant is an "employer" as defined by DE Code Tit. 19 § 710(7).

194.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it denied her tenure on March 13, 2020.

195.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it paid Vermeer's male colleagues, in similarly situated positions, more than what it paid her.

196.    Defendant violated the DDEA by discriminating against Vermeer, based on her sex, when it terminated her employment on September 23, 2020, effective August 31, 2021.

197.    Vermeer engaged in protected activity under the DDEA when on September 4, 2015, she disclosed to Jones, Weber, and Grasso the harassment and discrimination that she faced.

198.    Vermeer engaged in protected activity under the DDEA when she met with Weber on September 14, 2015 to discuss the abuse, harassment, discrimination and retaliation she was facing from Jones. Weber proceeded inappropriately to share this protected activity with Jones, who was the source of the abuse, harassment, discrimination, and retaliation.

199.    Vermeer engaged in protected activity under the DDEA when she met with an outside consultant on May 15, 2016 to discuss the abuse, harassment, discrimination, and retaliation that she was facing in her department.

200.     Vermeer engaged in protected activity under the DDEA when she met with Deputy Title IX Coordinator for Faculty at the time, Kinservik, in May and June of 2017 to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

201.     Vermeer engaged in protected activity under the DDEA when in between her meetings with Kinservik, she again met with the outside consultant to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

202.     Vermeer engaged in protected activity under the DDEA when she spoke with Kinservik again in July of 2017 to beg him to assist with the abuse, discrimination, harassment, and retaliation she was facing in her department.

203.     Vermeer engaged in protected activity under the DDEA when she emailed Kinservik on August 24, 2017 to ask him, again, for help regarding the abuse, harassment, discrimination, and retaliation that she was facing in her department.

204.     Vermeer engaged in protected activity under the DDEA in October 2017, when Vermeer met with Groff, then the Title IX Coordinator for the University, to report all her discriminatory and retaliatory experiences up to that point.

205.     Vermeer engaged in protected activity under the DDEA when in March of 2018 she communicated with Groff again to follow up on her reports of discriminatory and retaliatory experiences up to that point.

206.     Vermeer engaged in protected activity under the DDEA when in May of 2019 she asked Weber to have Joe and Jones recuse themselves from her promotion and tenure process.

207.     Vermeer engaged in protected activity under the DDEA when she submitted an appeal letter to Weber on January 7, 2020, detailing the discriminatory and retaliatory

experiences she had faced up to that point.

208.    Vermeer engaged in protected activity under the DDEA when in March of 2020 she submitted an appeal letter to Morgan detailing the discriminatory and retaliatory experiences she had faced up to that point.

209.    Vermeer engaged in protected activity under the DDEA on April 15, 2020, when Vermeer advised Morgan about the abuse, discrimination, and retaliation she had experienced both during her time at the University generally, and specifically as it related to her tenure application.

210.    Vermeer engaged in protected activity under the DDEA when she followed up on her meeting with Morgan by sending all the materials used for her presentation, detailing the discriminatory and retaliatory behaviors that she had faced up to that point.

211.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful retaliation.

212.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

**COUNT V**
**Discrimination Based on Family Responsibilities**
**Delaware Discrimination in Employment Act**
**DE Code Tit. 19 § 710, *et seq*.**

213.    Vermeer hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

214.    Vermeer is an "employee" as defined in DE Code Tit. 19 § 710(6).

215.    Defendant is an "employer" as defined by DE Code Tit. 19 § 710(7).

216.    Vermeer had family responsibilities as defined in DE Code Tit. 19 § 710(9).

217.    Defendant violated the DDEA by discriminating against Vermeer, based on her

family responsibilities, when it denied her tenure on March 13, 2020.

218.    Defendant violated the DDEA by discriminating against Vermeer, based on her family responsibilities, when it terminated her employment on September 23, 2020, effective August 31, 2021.

219.    Defendant violated the DDEA by discriminating against Vermeer, based on her family responsibilities, when Defendant paid her less than similarly situated employees who did not have family responsibilities.

220.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful family responsibilities discrimination.

221.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

**COUNT VI**
**Gender Discrimination**
**Title IX of the Education Amendments of 1972**
**20 U.S.C. §1681, *et seq*.**

222.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

223.    Title IX of the Educational Amendments of 1972 ("Title IX") states, "No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance."  20 U.S.C. § 1681(a).

224.    Defendant violated Title IX by subjecting Vermeer to discrimination on the basis of her sex throughout her employment and in her tenure evaluation process; it did so by denying her tenure application despite a showing of credentials that were the same or superior to similarly situated male colleagues who were granted tenure using the same, proper evaluation standards.

225.    Vermeer brought these instances of disparate treatment to the attention of Levine,

Weber, Kinservik, Jones, Morgan, and others during her P&T process, but they refused to acknowledge or address the disparate treatment.

226.    Defendant also violated Title IX by discriminating against Vermeer on the basis of sex-related stereotypes, based on her perceived inability to be a serious scholar because she is an involved mother of four daughters.

227.    Defendant's stated reasons for its treatment of Vermeer are pretext for its unlawful discrimination.

228.    Vermeer sustained substantial monetary and non-monetary damages as the result of Defendant's conduct.

## COUNT VII
### Retaliation
### Title IX of the Education Amendments of 1972
### 20 U.S.C. §1681, *et seq.*

229.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

230.    Defendant violated Title IX by subjecting Vermeer to discrimination on the basis of her sex throughout her employment and in her tenure evaluation process; it did so by denying her tenure application despite a showing of credentials that were the same or superior to similarly situated male colleagues who were granted tenure using the same, proper evaluation standards.

231.    Vermeer brought these instances of disparate treatment to the attention of Levine, Weber, Kinservik, Jones, Morgan, and others during her P&T process, but they refused to acknowledge or address the disparate treatment.

232.    Defendant also violated Title IX by discriminating against Vermeer on the basis of sex-related stereotypes, based on her perceived inability to be a serious scholar because she is an involved mother of four daughters.

233.    Vermeer engaged in protected activity under Title IX when on September 4, 2015, she disclosed to Jones the harassment and discrimination that she faced.

234.    Vermeer engaged in protected activity under Title IX when she met with Weber on September 14, 2015 to discuss the abuse, harassment, discrimination, and retaliation she was facing from Jones. Weber proceeded inappropriately when he shared this protected activity with Jones, who was the source of the abuse, harassment, discrimination, and retaliation.

235.    Vermeer engaged in protected activity under Title IX when she met with an outside consultant on May 15, 2016 to discuss the abuse, harassment, discrimination, and retaliation that she was facing in her department.

236.    Vermeer engaged in protected activity under Title IX when she met with Deputy Title IX Coordinator for Faculty at the time, Kinservik, in May and June of 2017 to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

237.    Vermeer engaged in protected activity under Title IX when in between her meetings with Kinservik, she again met with the outside consultant to report the abuse, harassment, discrimination, and retaliation that she was facing in her department.

238.    Vermeer engaged in protected activity under Title IX when she spoke with Kinservik again in July of 2017 to beg him to assist with the abuse, discrimination, harassment, and retaliation she was facing in her department.

239.    Vermeer engaged in protected activity under Title IX when she emailed Kinservik on August 24, 2017 to ask him, again, for help regarding the abuse, harassment, discrimination, and retaliation that she was facing in her department.

240.    Vermeer engaged in protected activity under Title IX in October 2017, when Vermeer met with Groff, then the Title IX Coordinator for Defendant, to report all her

discriminatory and retaliatory experiences up to that point.

241.    Vermeer engaged in protected activity under Title IX when in March of 2018 she communicated with Groff again to follow up on her reports of discriminatory and retaliatory experiences up to that point.

242.    Vermeer engaged in protected activity under Title IX when in May of 2019 she asked Weber to have Joe and Jones recuse themselves from her promotion and tenure process.

243.    Vermeer engaged in protected activity under Title IX when she submitted an appeal letter to Weber on January 7, 2020, detailing the discriminatory and retaliatory experiences she had faced up to that point.

244.    Vermeer engaged in protected activity under Title IX when in March of 2020 she submitted an appeal letter to Morgan detailing the discriminatory and retaliatory experiences she had faced up to that point.

245.    Vermeer engaged in protected activity under Title IX on April 15, 2020, when Vermeer advised Morgan about the abuse, discrimination, and retaliation she had experienced both during her time at the University generally, and specifically as it related to her tenure application.

246.    Vermeer engaged in protected activity under Title IX when she followed up on her meeting with Morgan by sending all the materials used for her presentation, detailing the discriminatory and retaliatory behaviors that she had faced up to that point.

247.    Vermeer engaged in a protected activity under Title IX when, prior to her tenure application, she met with Kinservik, and later with Susan Groff, to express her concerns about the ongoing harassing and discriminatory behavior of Jones, Weber, and Joe, based on Vermeer's sex, and how it might impact her tenure evaluation process.

248.    Defendant also failed to meaningfully address or act on Vermeer's complaints of abusive and discriminatory behavior based on her sex by allowing Jones, Weber, and Joe, to unfairly inject their discriminatory animus into the tenure evaluation process, causing the denial of Vermeer's tenure application.

249.    By exhibiting deliberate indifference to Vermeer's expressed concerns about the discriminatory and retaliatory behavior of Jones, Weber, Levine, and Joe, Defendant allowed Vermeer's tenure evaluation process to be controlled by individuals with a history of sex-based discriminatory behavior against Vermeer.  If Defendant had acted to remove Jones, Weber, Levine, and Joe from the tenure evaluation process, Vermeer's tenure application would have been properly and fairly evaluated and her tenure application would have been granted.

250.    During the promotion and tenure denial appeals process, Vermeer engaged in additional protected activities when she complained to multiple University administrators about the sex-based disparate treatment she received in the evaluation of her promotion and tenure application.

251.    Defendant again took materially adverse actions against Vermeer when, despite the findings of two independent University committees that the evaluation process was flawed and the committees' related recommendations that tenure be granted, Morgan denied Vermeer tenure without any analysis or explanation; further, Defendant denied Vermeer the one-year contract extension to which she was entitled as a sixth-year probationary faculty member.

252.    Morgan's decision to deny Vermeer tenure despite the recommendations of the University P&T and College P&T Committees was caused by Vermeer's protected activities in complaining about Defendant's disparate treatment of her tenure application because of her sex.

253.    Finally, if Vermeer had not been extensively pursuing her appeals, and in the

process highlighting Defendant's disparate treatment practices, she would have received the one-year contract extension granted by Morgan to other probationary faculty members but denied to Vermeer in retaliation for her protected activity under Title IX.

**COUNT VIII**
**Violation of**
**The Equal Pay Act of 1963**
**29 U.S.C. § 206**

254.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

255.    Vermeer was an "employee" as defined by 29 U.S.C. § 206.

256.    Defendant is an "employer" as defined by 29 U.S.C. § 206.

257.    Vermeer is female and is a member of the protected class that employers are prohibited from discriminating against on the basis of sex for equal work on jobs the performance of which requires equal skill, effort, and responsibility, and which are performed under similar working conditions. 29 U.S.C. § 206(d)(1).

258.    Defendant violated the EPA when it knowingly paid male comparators who had equal work in terms of skill, effort, and responsibility, more than it paid Vermeer.

259.    Defendant further violated the EPA when it knowingly paid male employees who had similar job experience, authority, and responsibilities more than it paid Vermeer.

260.    A defendant has the burden of proving that the pay differential is justified by one of the four statutory exemptions under the EPA: (1) a seniority system, (2) a merit system, (3) a system pegging earnings to quality or quantity of production, or (4) any factor other than sex.

261.    Defendant cannot prove any such exemption.

262.    Vermeer has similar seniority to male comparators who were paid more for jobs of similar skill, effort, and responsibility.

263.    Vermeer has similar merits to male comparators who were paid more for jobs of similar skill, effort, and responsibility.

264.    Defendant has stated no reasons that would indicate the pay differential is justified by any factor other than Vermeer's sex.

265.    Vermeer has sustained damages as the result of Defendant's illegal discrimination in violation of the EPA and is entitled to such legal or equitable relief as will effectuate the purposes of EPA, including but not limited to economic and compensatory damages, liquidated damages, and reasonable costs and attorneys' fees.

### Count IX
### Impermissible Escalation of Research Standards
### Breach of Contract

266.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

267.    Vermeer's employment agreement, which incorporated Defendant's policies as reflected in the Faculty Handbook, created an enforceable contract between Vermeer and Defendant.

268.    By failing to adhere to the policies regarding research standards for Vermeer's tenure and promotion evaluation as required by her employment agreement and the Faculty Handbook, Defendant breached the contract between it and Vermeer.

269.    As a result of Defendant's breach of contract, Vermeer suffered damages in the form of denial of her tenure and promotion application, and the time and expense of pursuing extensive administrative appeals.

### Count X
### Violation of Academic Freedom Rights
### Breach of Contract

270.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

271.    Vermeer's employment agreement, which incorporated Defendant's policies as reflected in the Faculty Handbook, created an enforceable contract between Vermeer and Defendant.

272.    Section 4.2.1 of the Faculty Handbook states in pertinent part:

> Academic freedom is indispensable to effective teaching, excellent research/creative activities, exemplary service, and shared governance.  Academic freedom is the right of faculty to examine and discuss all questions of interest to them, and to teach, publish, present, and speak, without censorship or external interference, even though their conclusions may be unpopular or contrary to public opinion (see 3.1.1).  . . . Academic freedom also encompasses the freedom to discuss any matter of institutional policy or practice, without institutional sanction.

273.    By failing to adhere to the appropriate policies regarding academic freedom, and for retaliating against Vermeer's exercise of academic freedom by determining to deny her tenure and promotion, Defendant breached the contract between it and Vermeer.

274.    As a result of Defendant's breach of contract, Vermeer suffered damages in the form of denial of her tenure and promotion application, and the time and expense of pursuing extensive administrative appeals.

**Count XI**
**Breach of Agreement to Extend Contract**
**Breach of Contract**

275.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

276.    By announcement dated March 24, 2020, Morgan, on behalf of Defendant, "granted a one-year extension to the tenure/contract clock" to tenure track faculty including those in their sixth year.

277.    As of March 24, 2020, Vermeer was a tenure track faculty, engaging in the contractually-guaranteed appeals process as set forth in the Faculty Handbook, who was in the sixth year of her tenure track position.

278.    Based on the contract extension provided by the March 24, 2020, announcement, Vermeer was entitled to a one-year contract extension (in addition to her terminal year) through August 2022.

279.    In breach of its contractual obligations under the Faculty Handbook and pursuant to the March 24 Announcement, Defendant refused to grant Vermeer the one-year contract extension that it promised to tenure track faculty members in their first six contract years.

## Count XII
### Breach of Covenant of Good Faith and Fair Dealing
### Breach of Contract

280.    Vermeer incorporates the preceding paragraphs as though realleged in full herein.

281.    The Faculty Handbook constitutes a valid and enforceable contract between the faculty of Defendant, including Vermeer, and Defendant.

282.    The Faculty Handbook prohibits bias and discrimination based on family relationships.  Faculty Handbook Section 4.2.10.[7]

283.    By discriminating and retaliating against Vermeer based on her family relationships with Tom Vermeer and her family obligations as a mother of four, Defendant

---

[7]    Section 4.2.10 sets forth several prohibitions against bias or favoritism based on family relationships.  For example, Section 4.2.10 states that "all faculty should avoid real or apparent conflict of interest, coercion, favoritism, or bias" involving "someone who is an immediate family member."  Faculty members also "should not participate in…institutional decisions (initial appointment, retention, promotion, salary, leave of absence, etc.) involving a direct benefit to members of their immediate families…"  Also, when a family member enrolls in a faculty member's course, "the faculty member should report the situation promptly to the appropriate administrative supervisor (chair, director or dean)" and the "supervisor should take effective steps to insure the unbiased evaluation or supervision of the student."

violated the contract or acted in bad faith and thereby frustrated the purpose and intent of the Faculty Handbook in breach of the implied covenant of good faith and fair dealing.

284.    As a direct and proximate result of Defendant's breach of the contract and the implied covenant of good faith and fair dealing, Vermeer has suffered damages including the denial of promotion and tenure.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Beth Vermeer respectfully requests that the Court enter judgment in her favor and award to her the following relief:

A.    Judgment against Defendant University of Delaware for economic damages, compensatory damages, liquidated damages, and punitive damages in amounts to be determined at trial;

B.    Pre-judgment interest;

C.    Employment, reinstatement, promotion and tenure, or other equitable relief;

D.    Economic damages including front and back pay;

E.    Compensatory damages;

F.    Interest due on unpaid wages;

G.    Injunctive and declaratory relief;

H.    Reasonable attorneys' fees and the costs of this action, and;

I.    Any other relief this Honorable Court deems just and proper to award.

*Of Counsel:*

R. Scott Oswald
Adam Augustine Carter
The Employment Law Group, P.C.
1717 K Street, N.W., Suite 1110
Washington, D.C. 20006-5345
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
acarter@employmentlawgroup.com

*Pro Hac Vice Motions To Be Filed*

Dated: October 25, 2021

Respectfully submitted,

*/s/ Matthew F. Boyer*
Matthew F. Boyer (DE Bar 2564)
Lauren P. DeLuca (DE Bar 6024)
Connolly Gallagher LLP
1201 Market Street, 20th Floor
Wilmington, DE 19801
(302) 884-6585
mboyer@connollygallagher.com

*Counsel for Plaintiff*