IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

BETH VERMEER,

               Plaintiff,

       v.

UNIVERSITY OF DELAWARE,

               Defendant.

Civil Action No. 21-1500-RGA

<u>MEMORANDUM OPINION</u>

Matthew F. Boyer, Lauren P. DeLuca, CONNOLLY GALLAGHER LLP, Wilmington, DE; R. Scott Oswald, Adam Augustine Carter, THE EMPLOYMENT LAW GROUP, P.C., Washington, D.C.,

     Attorneys for Plaintiff.

James D. Taylor, Jr., Jessica M. Jones, SAUL EWING ARNSTEIN & LEHR LLP, Wilmington, DE,

     Attorneys for Defendant.

September 8, 2022

/s/ Richard G. Andrews
**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant's Motion to Dismiss Plaintiff's Amended Complaint.   (D.I. 13).

I have considered the parties' briefing.   (D.I. 14, 15, 16).

## I.   BACKGROUND[1]

After teaching as a visiting professor in 2013-14, Plaintiff Beth Vermeer, Ph.D. was hired

as a tenure-track assistant professor in the Accounting and Management Information Systems

Department at the University of Delaware (the "University") beginning the fall semester of 2014.

(D.I. 12 at ¶ 11).   Around August 2014, Plaintiff brought concerns to Dr. Scott Jones, the then-

Department Chair, concerning the actions of Jones and Dr. Jennifer Joe, a chaired professor in

the Department, in relation to committee "governance.."   (*Id.* at ¶¶ 13–16).   Jones then began to

undermine Plaintiff's prospects for tenure at the University.   (*Id.* at ¶ 18).   For example, Jones

told Plaintiff, "I hold the hammer," and "we're going to make sure that you don't get tenure."

(*Id.* at ¶ 24).   Jones also made several sex-based discriminatory comments to Plaintiff.   (*Id.* at

¶¶ 20–21).

On September 14, 2015, Plaintiff reported Jones' "abuse, harassment, discrimination, and

retaliation" to Dr. Bruce Weber, Dean of the College.   (*Id.* at ¶¶ 15, 34).   Weber told Plaintiff

that he would bring in an outside consultant to address the situation.   (*Id.* at ¶ 37).   Plaintiff

later heard that Weber was "sickened" that he had to meet with Plaintiff and wanted her to leave

the University.   (*Id.* at ¶ 38).   In 2017, Plaintiff reported the ongoing discrimination and

retaliation to the University's Deputy Title IX Coordinator and Title IX Coordinator.   (*Id.* at ¶¶

49, 60).

---

[1]  I state the facts as alleged by Plaintiff and in the light most favorable to her.

On March 18, 2016, Plaintiff's contract was renewed for two years.   (*Id.* at ¶ 73).

In 2017, a committee led by Joe introduced a "higher" Promotion and Tenure ("P&T") research standard (the "2017 P&T Standards"), which was approved by the Provost in May 2018. (*Id.* at ¶ 76).   Per the Faculty Handbook, Plaintiff still had the right to be evaluated under the 2006 P&T Standards, which were in place at the time of her hiring.   (*Id.* at ¶¶ 70–71).   On February 9, 2018, the Department P&T Committee, chaired by Joe, renewed her contract and "escalated" the applicable research standard.   (*Id.* at ¶¶ 77-78).   Although the 2006 P&T Standards required publications in "quality and highly regarded refereed journals," the four-year renewal letter "'strongly advise[d] [Plaintiff] to submit her working papers for review and to make concerted efforts to achieve publications in premier and premier-plus journals."   (*Id.* at ¶ 79).   The language in the renewal letter was consistent with the 2017 P&T Standards.   (*Id.* at ¶ 81).

Plaintiff's process to decide whether she would be promoted and granted tenure began in May 2019.   (*Id.* at ¶ 87).   Plaintiff asked Dean Weber to instruct Jones and Joe to recuse themselves from that process.   (*Id.*).   Weber ignored her request.   (*Id.* at ¶ 88).   On September 16, 2019, the Department P&T Committee recommended by a vote of 7-6 against approving Plaintiff's application for tenure.   (*Id.* at ¶¶ 105, 107).   Jones and Joe, who served on the Committee, "heavily influenced" the Committee's deliberations and vote.   (*Id.* at ¶ 106).   In Plaintiff's "initial appeal," Dr. Carolyn Levine, the then-Department Chair, denied the appeal on October 21, 2019, because Plaintiff had not achieved "research excellence."   (*Id.* at ¶¶ 111–112).   On December 4, 2019, the Lerner College P&T Committee, by a 6-3 vote, determined that Plaintiff "had met the requirements for tenure."   (*Id.* at ¶ 118).

On January 2, 2020, Dean Weber rejected the Lerner College P&T Committee's conclusion, reasoning that Plaintiff's research was "not excellent" because Plaintiff had "no publications in undisputed top-tier journals."   (*Id.* at ¶¶ 120–121).   Within a few days, Plaintiff appealed to Weber, asking that he reconsider his decision, stating that she did have three "Top-Tier journal publications."   (*Id.* at ¶ 122).   In response, on January 24, 2020, Weber again "escalated" the research standard, requiring Plaintiff to have publications in "premier (top six) journals in accounting to meet the standard for research excellence."   (*Id.* at ¶¶ 123–124).   "On February 14, 2020, the University P&T Committee (one level up from the [Lerner] College P&T Committee) unanimously overturned Weber's denial and voted in favor of [Plaintiff's] tenure."   (*Id.* at ¶ 127).   The University P&T Committee applied the 2006 P&T Standards and agreed with Plaintiff that "the 'goalposts' were unfairly moved" by Weber.   (*Id.* at ¶¶ 127–128).

In a brief letter on March 13, 2020, Provost Morgan rejected the University P&T Committee's conclusions and recommended denial of tenure.   (*Id.* at ¶ 130).   Plaintiff appealed Morgan's "initial recommendation."   (*Id.* at ¶ 131).   Plaintiff met with Morgan on April 15, 2020, and reported the "abuse, discrimination, and retaliation she had experienced," both generally and in the tenure process.   (*Id.* at ¶ 132).   On April 30, 2020, Morgan, relying on the determinations of Weber, Levine, and the Department P&T Committee, denied Plaintiff's final appeal regarding promotion and tenure.   (*Id.* at ¶ 135).

On March 24, 2020, while Plaintiff's appeal in her P&T process was pending, Provost Morgan announced that "all probationary [tenure-track] faculty (*i.e.*, all who are in their first 6 years) are granted a one-year extension to the tenure/contract clock."   (*Id.* at ¶ 138).   The University did not grant Plaintiff this one-year extension.   (*Id.* at ¶ 141).   Instead, on September

3

23, 2020, Plaintiff was notified that because she had not achieved tenure within six years, her employment would be terminated on August 31, 2021.   (*Id.*).

On February 4, 2022, Plaintiff filed the Amended Complaint against the University, alleging discrimination under Title VII, Title IX, and the Delaware Discrimination in Employment Act ("DDEA"); retaliation under Title VII, Title IX, the DDEA, and the Equal Pay Act ("EPA"); violations of the EPA; breach of contract; and breach of the implied covenant of good faith and fair dealing.   (D.I. 12).   The University has moved to dismiss all counts for failure to state a claim.   (D.I. 13).

## II.   LEGAL STANDARD

Rule 8 requires a complainant to provide "a short and plain statement of the claim showing that the pleader is entitled to relief."   FED. R. CIV. P. 8(a)(2).   Rule 12(b)(6) allows the accused party to bring a motion to dismiss the claim for failing to meet this standard.   A Rule 12(b)(6) motion may be granted only if, accepting the well-pleaded allegations in the complaint as true and viewing them in the light most favorable to the complainant, a court concludes that those allegations "could not raise a claim of entitlement to relief."   *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 558 (2007).

The factual allegations do not have to be detailed, but they must provide more than labels, conclusions, or a "formulaic recitation" of the claim elements.   *Id.* at 555 ("Factual allegations must be enough to raise a right to relief above the speculative level . . . on the assumption that all the allegations in the complaint are true (even if doubtful in fact).").   Moreover, there must be sufficient factual matter to state a facially plausible claim to relief.   *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).   The facial plausibility standard is satisfied when the complaint's factual content "allows the court to draw the reasonable inference that the

defendant is liable for the misconduct alleged." *Id.* ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." (internal quotation marks omitted)).

## III.    DISCUSSION

### A.  Sex and Gender Discrimination (Counts I, III, and VII)

Plaintiff brings claims for sex discrimination under Title VII (Count I), sex discrimination under the DDEA (Count III), and gender discrimination under Title IX (Count VII).   She alleges that the University discriminated against her, based on her sex and gender, when it denied her tenure.   To state a claim for sex discrimination under Title VII, Plaintiff must allege: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).[2]   "A plaintiff need not convince the court of any of these elements at the motion to dismiss stage, but must submit more than [a] naked assertion that she suffered an adverse employment action because of her membership in a protected class."   *Blades v. Mosaic of Del.*, 2017 WL 3868238, at *6 (D. Del. Aug. 31, 2017) (cleaned up).

The University argues that Plaintiff has failed to allege sufficient factual matter to support an inference that she was denied tenure because of her sex.   (D.I. 14 at 7).   To support

---

[2]  The same standard applies for Plaintiff's claims for sex discrimination under Title IX and the DDEA.   *See Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."); *Hyland v. Smyrna Sch. Dist.*, 608 F. App'x 79, 83 n.5 (3d Cir. 2015) ("[T]he standards under Title VII and the DDEA are generally the same . . . .").

an inference of intentional discrimination, Plaintiff can show that similarly situated employees outside her protected class were treated more favorably.   "To be 'similarly situated,' parties must be 'alike in all relevant aspects.'"   *Perano v. Twp. of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011) (quoting *Startzell v. City of Phila.*, 533 F.3d 183, 203 (3d Cir. 2008)).

Plaintiff alleges that two male professors—Dr. Dave Jenkins and Dr. Tom Vermeer— were treated more favorably than her.   Plaintiff alleges that her research record was comparable to that of Dr. Vermeer, who earned tenure in 2012, and was better than that of Dr. Jenkins, who earned tenure in 2008.   (D.I. 12 at ¶ 113).   Both professors earned tenure under the 2006 P&T Standards even though neither had a "premier (top six)" publication.   (*Id.* at ¶ 125).   Thus, Weber's assertion, that Plaintiff needed "premier (top six)" publications to meet the standard of research excellence in the 2006 P&T Standards, was false.   (*Id.* at ¶ 124).   These factual allegations are sufficient to support the reasonable inference that these two male comparators were similarly situated to Plaintiff and received more favorable treatment than she did.   *See Rodriguez v. Wendover, Inc*, 2021 WL 2117205, at *3 (D. Del. May 25, 2021) ("Because [Plaintiff] has proffered at least one circumstance giving rise to an inference of intentional discrimination, she has stated a plausible claim of sex discrimination.").

The University argues, however that since Dr. Jenkins and Dr. Vermeer earned tenure outside the applicable limitations period, their favorable treatment cannot support Plaintiff's discrimination claims.   (D.I. 14 at 10–11 (citing *Tabb v. Bd. of Educ. of Durham Pub. Schs.*, 2020 WL 5768853, at *20 (M.D.N.C. Sept. 28, 2020), *aff'd*, 29 F.4th 148 (4th Cir. 2022); *EklecCo NewCo LLC v. Town of Clarkstown*, 2019 WL 2210798, at *9 (S.D.N.Y. May 21, 2019); *Colley v. Waste Mgmt. of Ala., Inc.*, 2001 WL 228058, at *3 (S.D. Ala. Feb. 7, 2001))).   I disagree.

6

Plaintiff's discrimination claims arise from the University's denial of her tenure—an act that undisputedly occurred within the limitations period.   Evidence about how Plaintiff's male comparators were treated is relevant to the issue of whether this denial of tenure was based on Plaintiff's sex.   The fact that the favorable treatment of her male comparators falls outside the limitations period is not a reason to dismiss Plaintiff's timely-filed claims.   *See Brinkley-Obu v. Hughes Training, Inc.*, 36 F.3d 336, 346 (4th Cir. 1994) ("Statutes of limitations do not operate as an evidentiary bar controlling the evidence admissible at the trial of a timely-filed cause of action.").   I therefore conclude that Plaintiff can rely on favorable treatment outside the limitations period to support her discrimination claims.   *Cf. Vereen v. Woodland Hills Sch. Dist.*, 2008 WL 794451, at *23 (W.D. Pa. Mar. 24, 2008) ("[Plaintiff] may, however, use male employees employed by the School District prior to the limitations period as comparators for purposes of establishing her prima facie case [under the Equal Pay Act].").

Plaintiff has alleged sufficient factual matter to support an inference that she was denied tenure because of her sex.   Thus, I deny the motion to dismiss Counts I, III,[3] and VII.

## B.   Family Responsibilities and Marital Status Discrimination (Counts V and VI)

Plaintiff brings claims under the DDEA for discrimination based on family responsibilities (Count V) and marital status (Count VI).   Under the DDEA, it is an unlawful employment practice for an employer "to discharge any individual or otherwise to discriminate against any individual with respect to compensation, terms, conditions or privileges of

---

[3]   The University argues that Plaintiff's DDEA claim must be dismissed because Plaintiff cannot maintain a claim under both Title VII and the DDEA.   (D.I. 14 at 7 n.6).   As I have previously acknowledged, the law is unsettled as to whether a plaintiff can proceed under both Title VII and the DDEA.   *Wooten v. City of Wilmington*, 2021 WL 411707, at *7 (D. Del. Feb. 5, 2021).   Thus, I will allow Plaintiff's claims under both Title VII and the DDEA to proceed.   *Id.*

employment because of such individual's . . . marital status" or "family responsibilities."[4]   DEL. CODE ANN. tit. 19, § 711(a)(1) & (k)(1)(a).

Plaintiff alleges that the University discriminated against her, based on her family responsibilities and marital status, when it denied her tenure.   The University argues that Plaintiff has failed to allege circumstances giving rise to an inference of intentional discrimination.   (D.I. 14 at 7–8 & n. 7).   The Complaint does not identify any comparators outside of Plaintiff's protected class for her family responsibilities and marital status claims.[5] (*See generally* D.I. 12).   Instead, Plaintiff argues that certain statements made by Joe, Levine, and Jones support an inference of discrimination.   (D.I. 15 at 17–18).

For example, soon after Plaintiff and Joe met, Joe told Plaintiff that she would need a full-time nanny if she wanted to be taken seriously.   (D.I. 12 at ¶¶ 66–67).   In the fall of 2018, Levine mocked Plaintiff for bringing brownies to the office, as Levine did not have time to bake because she had a "real job" and "didn't have time for that nonsense."[6]   (*Id.* at ¶ 68).   Jones repeatedly told Plaintiff that her husband was the "major breadwinner," that Plaintiff could

---

[4] The DDEA defines "family responsibilities" as "the obligations of an employee to care for any family member who would qualify as a covered family member under the Family and Medical Leave Act."   DEL. CODE ANN. tit. 19, § 710(9).

[5] Plaintiff alleges that she was paid less than similarly situated employees who did not have family responsibilities or who were not married.   (D.I. 12 at ¶¶ 222, 231).   Plaintiff, however, does not allege any facts identifying specific unmarried comparators without family responsibilities who were paid more than Plaintiff.   These conclusory allegations are thus insufficient.   *See Perano*, 423 F. App'x at 238 ("At the motion to dismiss stage, [Plaintiff] must allege facts sufficient to make plausible the existence of such similarly situated parties.").

[6] I assume for present purposes that this is a comment on family responsibilities, although it seems more like just a silly comment.

always "fall back" on her husband, and "that her role as a mother of four daughters made her career inferior."   (*Id.* at ¶ 69).

Levine, Joe, and Jones did not make the ultimate decision to deny Plaintiff tenure, Morgan did.   Thus, these stray comments alone are insufficient to support an inference that Morgan's decision to deny tenure was based on Plaintiff's family responsibilities or her status as a married person.   *See Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509, 545 (3d Cir. 1992) ("Stray remarks by non-decisionmakers . . . are rarely given great weight, particularly if they were made temporally remote from the date of decision."); *Cridland v. Kmart Corp.*, 929 F. Supp. 2d 377, 389 (E.D. Pa. 2013) ("Under Third Circuit precedent, 'stray remarks' unconnected from an adverse employment decision are insufficient to show invidious purpose.").

Yet, Plaintiff argues that there are sufficient allegations supporting an inference that Morgan's decision was based on Plaintiff's family responsibilities or marital status under the "cat's paw" doctrine.   (D.I. 15 at 14, 17–18).   Under the "cat's paw" theory, an employer is liable for discrimination when "a non-biased decision-maker is influenced by a biased managerial employee."   *Carter v. Midway Slots & Simulcast*, 894 F. Supp. 2d 529, 543 (D. Del. 2012), *aff'd*, 511 F. App'x 125 (3d Cir. 2013).   Specifically, "[I]f a supervisor performs an act motivated by [discriminatory] animus that is *intended* by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable[.]"   *Staub v. Proctor Hosp.*, 562 U.S. 411, 422 (2011) (footnote omitted).

Plaintiff argues that Morgan's tenure decision was influenced by the discriminatory animus of Weber, Jones, Joe, and Levine because Morgan relied on the reports of Weber, Levine, and the Department P&T Committee.   (D.I. 15 at 14).   There are no allegations, however, supporting an inference that the reports of Weber, Levine, and the Department P&T

9

Committee were motivated by a discriminatory animus towards Plaintiff's family responsibilities or status as a married person.

Although Levine, Joe, and Jones made certain discriminatory comments regarding Plaintiff's family responsibilities and marital status, these comments were isolated and were made over a period of several years prior to the denial of Plaintiff's tenure.   Thus, these comments alone are insufficient to support an inference that the reports of Weber, Levine, and the Department P&T Committee were based on family responsibilities or marital status discrimination.  *See Hyland v. Am. Int'l Grp.*, 360 F. App'x 365, 367–68 (3d Cir. 2010) (finding that a supervisor's "stray remark made ten months before [the plaintiff]'s termination" in which the supervisor referred to the plaintiff as the "old man" did "not support an inference of age discrimination underlying [the plaintiff]'s termination"); *Ezold*, 983 F.2d at 545 ("Stray remarks . . . by decisionmakers unrelated to the decision process are rarely given great weight, particularly if they were made temporally remote from the date of decision.").   Accordingly, I find that the factual allegations do not support liability under the cat's paw theory.

Plaintiff has therefore failed to plead sufficient allegations supporting an inference that Plaintiff was denied tenure because of her family responsibilities or status as a married person.

For her marital status discrimination claim, Plaintiff argues that she also suffered discrimination based on her spouse's identity (rather than her status as a married person).   (D.I. 15 at 18).   Plaintiff's husband, Dr. Tom Vermeer, was a tenured professor in the same department.   (D.I. 12 at ¶ 23).   Plaintiff alleges that Jones and Weber disliked Dr. Tom Vermeer and conspired to deny Plaintiff tenure "so she and Tom will leave" the University.   (*Id.* at ¶¶ 33, 56–58).   I do not think that the identity of Plaintiff's spouse supports a DDEA marital status

discrimination claim.   Plaintiff's marriage to Tom Vermeer is not a protected characteristic (apart from Plaintiff's status as a married person).

Plaintiff argues that in *Kenny v. University of Delaware*, 2018 WL 1022576 (D. Del. Feb. 22, 2018), this Court indicated that the identity of the plaintiff's spouse is relevant to a claim of marital discrimination under the DDEA.   (D.I. 15 at 18–19).   In *Kenny*, however, the identity of the plaintiff's spouse was relevant because plaintiff was married to a person of the same gender. *Kenny*, 2018 WL 1022576, at *5.   That is not the case here.

For the above reasons, I will grant the motion to dismiss Counts V and VI.

### C.  Retaliation (Counts II, IV, VIII, and X)

Plaintiff brings four claims for retaliation under Title VII (Count II), the DDEA (Count IV), Title IX (Count VIII), and the Equal Pay Act ("EPA") (Count X).   She alleges that the University retaliated against her for reporting sex discrimination when it denied her tenure. (D.I. 15 at 16). To state a claim for retaliation, Plaintiff must allege that: (1) she engaged in a protected activity; "(2) the employer took an adverse employment action against her; and (3) there was a causal connection between her participation in the protected activity and the adverse employment action."   *Moore v. City of Phila.*, 461 F.3d 331, 340–41 (3d Cir. 2006) (citation omitted) (Title VII); *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 564 (3d Cir. 2017) (Title IX); *Wooten v. City of Wilmington*, 2021 WL 411707, at *7 (D. Del. Feb. 5, 2021) (DDEA); *Shawley v. Jim Shorkey 1 White Oak, LLC*, 2022 WL 1539957, at *15 (W.D. Pa. May 16, 2022) (EPA).

The University argues that Plaintiff has failed to allege that she was denied tenure because she complained about sex, marital status, or family responsibility discrimination or her unequal pay.   (D.I. 14 at 12–13).   I agree.   For purposes of this motion, I assume that Provost Morgan's final April 30, 2020 denial of Plaintiff's tenure application and the University's failure

11

to grant Plaintiff the one-year contract extension are both actionable adverse actions.   Plaintiff

has failed to allege any facts supporting a causal link between her complaints of discrimination

and these adverse actions.

Morgan issued her initial denial of tenure on March 13, 2020.   (D.I. 12 at ¶ 130).

Plaintiff first reported the discrimination to Morgan during an appeal meeting on April 15, 2020.

(*Id.* at ¶ 132).   There are no allegations that Morgan was aware of Plaintiff's previous

complaints of discrimination.   Accordingly, Plaintiff's April 15, 2020 complaint could not have

motivated Morgan's initial decision to deny tenure.   *Ambrose v. Twp. of Robinson*, 303 F.3d

488, 493 (3d Cir. 2002) ("It is only intuitive that for protected conduct to be a substantial or

motiving factor in a decision, the decisionmakers must be aware of the protected conduct.").

Plaintiff has therefore failed to plausibly allege that her complaint of discrimination was the but-

for cause of Morgan's denial of Plaintiff's appeal of Morgan's March 13, 2020 decision.   That

Plaintiff then told Morgan about the history of discrimination and retaliation while arguing for

Morgan to change her decision does not provide a basis by itself to infer that Morgan's

consistent final decision was the but-for cause of the final denial.

The same is true for the University's failure to grant Plaintiff a one-year contract

extension.   There are no allegations in the complaint supporting an inference that Plaintiff was

denied this extension because she complained about discrimination.   The only reasonable

inference suggested by the complaint is that she was denied this extension because she was

denied tenure.   (*See* D.I. 12 at ¶ 141).

Because Plaintiff has not plausibly alleged a causal link between these adverse actions

and her complaints of discrimination, I will grant the motion to dismiss Counts II, IV, VIII, and

X.

### D.  Unequal Pay under the EPA (Count IX)

The University argues that Plaintiff has failed to state a claim under the EPA.   (D.I. 14 at

14–16).   To state a valid EPA claim, Plaintiff must assert that "an employer pays different

wages to employees of opposite sexes 'for equal work on jobs the performance of which requires

equal skill, effort, and responsibility, and which are performed under similar working

conditions.'"   *Corning Glass Works v. Brennan,* 417 U.S. 188, 195 (1974) (quoting 29 U.S.C. §

206(d)(1)).

Plaintiff alleges that she was paid less than "two similarly situated untenured male faculty

in her department"—Dr. Mike Jung and Dr. Nir Yehuda.   (D.I. 12 at ¶ 119).   She alleges that

these two "male comparators" had "equal work in terms of skill, effort, and responsibility."   (*Id.*

at ¶ 269).   These allegations, however, are conclusory and do not equate to more than a

recitation of the elements of an EPA claim.   *See, e.g.*, *Gumbs v. Del. Dep't of Lab.*, 2015 WL

3793539, at *3 (D. Del. June 17, 2015) (granting a motion to dismiss a complaint containing

similar allegations).   Thus, I will grant the motion to dismiss Count IX.

### E.  Breach of Contract (Counts XI, XII, and XIII)

To state a claim for breach of contract, Plaintiff must plead: (1) the existence of a

contract; (2) the breach of an obligation imposed by the contract; and (3) resulting damage.

*VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

Plaintiff brings three breach of contract claims.   Count XI alleges that the University

breached Plaintiff's employment agreement "[b]y failing to adhere to the policies regarding

research standards for [Plaintiff]'s tenure and promotion evaluation as required by her

employment agreement and the Faculty Handbook."   (D.I. 12 at ¶ 284).   Count XII alleges that

the University breached the employment agreement "[b]y failing to adhere to the appropriate

13

policies regarding academic freedom, and for retaliating against [Plaintiff]'s exercise of academic freedom by determining to deny her tenure and promotion." (*Id.* at ¶ 289). Count XIII alleges that the University breached its obligations under the Faculty Handbook and the March 24 Announcement by failing to grant Plaintiff the one-year contract extension it promised to tenure-track faculty members. (*Id.* at ¶ 295).

The University first argues that Plaintiff has failed to identify the "specific and definite" provisions of her employment agreement that have been breached. (D.I. 14 at 16–17). I disagree. The Complaint does identify the contractual provisions that have been breached: Faculty Handbook § 4.4.13 (research standards) (D.I. 12 at ¶ 70), Faculty Handbook § 4.2.1 (academic freedom) (*id.* at ¶ 288), and the Provost's March 24, 2020 contract extension announcement (*id.* at ¶¶ 138, 292).

Plaintiff's employment contract incorporates the Faculty Handbook by reference. The contract states, "Separate and apart from your annual performance appraisal, you will be evaluated through peer review regarding your progress toward tenure, according to the procedures set forth in the Handbook for Faculty and in College and Department promotion and tenure policies and procedures." (D.I. 12-1, Ex. B, at 1; *see also id.* ("Your employment will be governed by all applicable University policies and procedures . . . .")). Under Delaware law, "Where a contract is executed which refers to another instrument and makes the conditions of such other instrument a part of it, the two will be interpreted together as the agreement of the parties." *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261, 1278 (Del. Super. Ct. 2001). Accordingly, Plaintiff's employment contract with the University includes the rights and obligations set forth in the Faculty Handbook. *See Golovan v. Univ. of Del.*, 73 F. Supp. 3d

14

442, 453 & n.2 (D. Del. 2014) (holding, based on the same language, that the Faculty Handbook was incorporated by reference in plaintiff's employment agreement).

### 1.   Impermissible "Escalation" of Research Standards (Count XI)

Section 4.4.13 of the Faculty Handbook provides, "Those faculty who are candidates for promotion and/or tenure . . . have the right to be reviewed under the policy and procedure in force at the time of hiring, rather than under any revised policy or procedure subsequently adopted."   (D.I. 12-1, Ex. C, § 4.4.13).   In Count XI, Plaintiff claims that the University breached this section when it evaluated her research under the "escalated" 2017 P&T Standards, instead of the 2006 P&T Standards in place when she was hired.   (*See* D.I. 12 at ¶¶ 71, 120, 130, 284).   Plaintiff alleges that the University first raised the applicable research standard on February 9, 2018, when the P&T Committee issued the four-year renewal letter.   (*Id.* at ¶ 78). The University argues (in a footnote) that Count XI is time-barred because this breach falls outside of the three-year statute of limitations.[7]   (D.I. 14 at 17 n.14); *GRT, Inc. v. Marathon GTF Tech., Ltd.*, 2011 WL 2682898, at *6 (Del. Ch. July 11, 2011) ("The three-year period typically begins to run when the contract is breached, whether or not the plaintiff was aware of such breach.").

Plaintiff responds that the 2018 renewal letter was not the only violation, and the University continued the "escalation" of the research standards throughout her tenure process. (D.I. 15 at 8 n.6).   For example, Weber raised the research standard in January 2020 when he rejected the conclusion of the College P&T Committee and declined to recommend tenure. (D.I. 12 at ¶¶ 120–128).   In overturning Weber's denial, the University P&T Committee

---

[7]  Plaintiff filed her initial Complaint on October 25, 2021.   (D.I. 1).

acknowledged that Weber "unfairly moved" the "goalposts."   (*Id.* at ¶ 128).   Plaintiff also

alleges that Provost Morgan improperly raised the research standard when making her final

decision denying tenure on April 30, 2020.   (*Id.* at ¶ 135).

These incidents are separate breaches and fall within the limitations period.   Thus, I deny

the motion to dismiss Count XI.

### 2.   Violation of Academic Freedom Rights (Count XII)

Count XII is based on the University's breach of Section 4.2.1 of the Faculty Handbook.

Section 4.2.1 provides:

> Academic freedom is indispensable to effective teaching, excellent research/creative
> activities, exemplary service, and shared governance. Academic freedom is the right of
> faculty to examine and discuss all questions of interest to them, and to teach, publish,
> present, and speak, without censorship or external interference, even though their
> conclusions may be unpopular or contrary to public opinion (see 3.1.1). . . . Academic
> freedom also encompasses the freedom to discuss any matter of institutional policy or
> practice, without institutional sanction.

(D.I. 12-1, Ex. C, § 4.2.1).

The University argues that this language does not create any binding contractual

obligation because it does not identify "a single definite, specific, and clear undertaking by the

University with respect to Plaintiff."   (D.I. 14 at 17–19).   I agree.   This section merely defines

academic freedom and does not create any specific and definite obligations on behalf of the

University.   *See Vurimindi v. Fuqua Sch. of Bus.*, 435 F. App'x 129, 133–34 (3d Cir. 2011)

(affirming the dismissal of plaintiff's breach of contract claim based on the college's general

anti-harassment policy because this policy simply presented the college's view that harassment is

unacceptable); *see also BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*,

2009 WL 264088, at *4 (Del. Ch. Feb. 3, 2009) ("Delaware courts will not enforce an agreement

that is indefinite as to any material or essential term.").

16

I therefore grant the motion to dismiss Count XII.

### 3.    Breach of Agreement to Extend Contract (Count XIII)

In Count XIII, Plaintiff claims that the University breached its contract by failing to grant Plaintiff a one-year contract extension.   The parties disagree as to whether Plaintiff was entitled to the one-year contract extension granted in Provost Morgan's March 24, 2020 announcement. The University argues that Plaintiff was denied tenure on March 13, 2020, so she was not "tenure-track faculty" on March 24, 2020 and thus was not entitled to the extension.   (D.I. 14 at 19).[8]   Plaintiff argues that the Provost's March 13 letter was "an initial recommendation of tenure denial" and the tenure process was not complete until the Provost issued her final decision after appeal on April 30, 2020.   (D.I. 15 at 11).

The University's argument requires this Court to interpret the relevant provisions of the Faculty Handbook to determine whether Plaintiff was a "tenure-track faculty" member as of March 24, 2020.   This inquiry is not suitable to resolution on a motion to dismiss and is more amenable to a determination at the summary judgment stage.   *See Universal Am. Corp. v. Partners Healthcare Sols. Holdings, L.P.*, 61 F. Supp. 3d 391, 400 (D. Del. 2014).   Thus, I deny the motion to dismiss Count XIII.

### F.  Implied Covenant of Good Faith and Fair Dealing (Count XIV)

To state a claim for breach of the implied covenant of good faith and fair dealing, Plaintiff must allege: "a specific implied contractual obligation, a breach of that obligation by the

---

[8]  In its reply brief, the University also argues that the March 24, 2020 announcement is not an enforceable contract.   (D.I. 16 at 2–3).   The extension announcement appears to have been unilateral.   Plaintiff, though, has had no opportunity to respond to the argument.   Since the argument was raised for the first time in the reply brief, I will not consider it here.   *See Sprint Commc'ns Co. L.P. v. Cequel Commc'ns, LLC*, 2022 WL 609213, at *3 (D. Del. Jan. 27, 2022); D. Del. LR 7.1.3(c)(2).

defendant, and resulting damage to the plaintiff." *MHS Cap. LLC v. Goggin*, 2018 WL

2149718, at *11 (Del. Ch. May 10, 2018).

 In Delaware, the implied duty of good faith and fair dealing is a "limited and

extraordinary legal remedy," which only "requires a party in a contractual relationship to refrain

from arbitrary or unreasonable conduct which has the effect of preventing the other party to the

contract from receiving the fruits of the bargain." *Nemec v. Shrader*, 991 A.2d 1120, 1128 (Del.

2010). The implied covenant of good faith and fair dealing cannot be used by a party to expand

its contract rights where the contract speaks to that party's rights. *Allied Cap. Corp. v. GC-Sun*

*Holdings, L.P.*, 910 A.2d 1020, 1032 (Del. Ch. 2006) ("[I]mplied covenant analysis will only be

applied when the contract is truly silent with respect to the matter at hand . . . .").

 To determine whether the implied covenant applies, the Court must first determine

whether there is a contractual gap. If a contractual gap exists, the Court must "consider whether

implied contractual terms fill the gap." *MHS*, 2018 WL 2149718, at *12. To do this, the Court

determines "whether it is clear from what was expressly agreed upon that the parties who

negotiated the express terms of the contract would have agreed to proscribe the act later

complained of as a breach of the implied covenant of good faith—had they thought to negotiate

with respect to that matter." *Id.*

 Plaintiff alleges that the University violated its implied covenant against family bias

when it denied her tenure because she was married to Tom Vermeer. (*See* D.I. 12 at ¶ 299).

Section 4.2.10 of the Faculty Handbook states, "[A]ll faculty should avoid real or apparent

conflict of interest, coercion, favoritism, or bias by not serving in evaluative roles involving

someone who is an immediate family member." (D.I. 12-1, Ex. C, § 4.2.10). Plaintiff argues

that this anti-nepotism policy contains an implied obligation prohibiting tenure denials motivated by bias against an immediate family member.   (D.I. 15 at 10).

The Complaint, however, does not include any allegations which would justify implying this contract term.   *See Nemec*, 991 A.2d at 1126 ("[Courts] will only imply contract terms when the party asserting the implied covenant proves that the other party has acted arbitrarily or unreasonably, thereby frustrating the fruits of the bargain that the asserting party reasonably expected.").   Notably, the Faculty Handbook contains many policies and procedures governing the promotion and tenure process.   (*See, e.g.*, D.I. 12-1, Ex. C, §§ 4.4.1, 4.4.3).   These policies specify the relevant considerations for a promotion decision—i.e., that the tenure decision should be based on the merits.   (*See id.*, § 4.4.3).   Because the contract is not truly silent with respect to the matter at hand, the implied covenant does not apply in this case.

I therefore grant the University's motion to dismiss Count XIV.

## IV.   CONCLUSION

An appropriate order will issue.

19