**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| BETH VERMEER, | |
| Plaintiff, | |
| v. | Civil Action No. 21-1500-RGA |
| UNIVERSITY OF DELAWARE, | |
| Defendant. | |

<u>MEMORANDUM OPINION</u>

Matthew F. Boyer (argued), Lauren P. DeLuca, CONNOLLY GALLAGHER LLP, Wilmington, DE; Stephen G. Grygiel (argued), GRYGIEL LAW LLC, Clinton, NY,

      Attorneys for Plaintiff.

James D. Taylor, Jr. (argued), Jessica M. Jones, Juliana G. Clifton, SAUL EWING LLP, Wilmington, DE,

      Attorneys for Defendant.

January ____, 2024

**ANDREWS, UNITED STATES DISTRICT JUDGE:**

Before me are Plaintiff Beth Vermeer's motion for partial summary judgment (D.I. 78) and Defendant University of Delaware's motion to dismiss and for summary judgment (D.I. 76). The motions have been fully briefed. (D.I. 77, 79, 93, 94, 103, 104). I heard extensive oral argument on December 7, 2023.[1]

For the reasons set forth below, Defendant's motion is DENIED with respect to the discrimination and retaliation claims. Defendant's motion is DISMISSED without prejudice with respect to back pay, front pay, and tuition-related damages. Defendant's motion is GRANTED with respect to the breach of contract claim on "escalation" of research standards. Defendant's motion on the one-year contract extension claim is DENIED.

Plaintiff's motion on the research standards claim is DENIED. Plaintiff's motion on the contract extension claim is GRANTED.

## I.   BACKGROUND

Defendant hired Plaintiff as a tenure-track assistant professor in the Accounting and Management Information Systems Department. (D.I. 77 at 5; D.I. 94 at 2–3). She started in 2014 and began serving on the departmental hiring committee that year. (D.I. 44 ¶¶ 11, 13). Plaintiff contends she brought concerns to Dr. Scott Jones, the then-department chair, because Jones and Dr. Jennifer Joe, a professor in the department, were "circumvent[ing]" the committee's work to hire candidates Joe favored. (*Id.* ¶¶ 15–16). Plaintiff contends Jones then began to undermine Plaintiff's prospects for tenure (*id.* ¶ 18) and made sex-based discriminatory comments to her (*id.* ¶¶ 20–21). Plaintiff contends she reported Jones's "pattern of threatening

---

[1] Citations to the transcript of the argument, which is not yet docketed, are in the format "Hearing Tr. at ___."

and harassing behavior" to Dr. Bruce Weber, Dean of the Lerner College[2] (*id.* ¶ 34), and she reached out to the Deputy Title IX Coordinator and Title IX Coordinator (*id.* ¶¶ 54, 64).

Plaintiff also contends Joe led an effort to introduce a "higher research standard" for promotion and tenure, and the University Provost approved the new standard in 2018. (*Id.* ¶ 80). Per the Faculty Handbook, Plaintiff had the right to be evaluated for tenure under the 2006 standard, which was in place at the time of her hiring. (*Id.* ¶¶ 74–76). Plaintiff contends, however, that her four-year renewal letter in 2018 "escalated" the applicable standard. (*Id.* ¶¶ 82–84). While Plaintiff contends the 2006 standard only required publication in "'refereed' and 'high quality, refereed' journals," the renewal letter advised her "to achieve publications in premier and premier-plus journals." (*Id.* ¶ 84).

Plaintiff's tenure review process began in 2019. (*Id.* ¶ 91). A departmental committee recommended by a vote of 7-6 against granting tenure. (*Id.* ¶ 112). Dr. Carolyn Levine, the department chair, denied the appeal of that recommendation, finding that Plaintiff had not achieved "research excellence." (*Id.* ¶ 117). The Lerner College promotion and tenure committee ("College Committee"), by a 6-3 vote, subsequently determined that Plaintiff had met the requirements for tenure. (*Id.* ¶ 124).

On January 2, 2020, Dean Weber rejected the College Committee's conclusion; he reasoned that Plaintiff's research was "not excellent" because she had "no publications in undisputed top-tier journals." (*Id.* ¶ 126). Plaintiff appealed to Dean Weber and raised concerns about "systemic prejudice and gender bias" (*id.* ¶ 128), but he denied the appeal (*id.* ¶ 129). On February 14, 2020, the University's promotion and tenure committee ("University Committee")

---

[2] Vermeer's department was part of the Lerner College.

unanimously disagreed with Dean Weber. (*Id.* ¶ 133). The University Committee found that "the 'goalposts' were unfairly moved." (*Id.* ¶ 134).

Provost Robin Morgan rejected the University Committee's conclusions and denied Plaintiff's tenure application. (D.I. 77 at 13). Plaintiff appealed this decision (*id.* at 14) and spoke with Provost Morgan (D.I. 79 at 13). Provost Morgan denied Plaintiff's final appeal on April 30, 2020. (D.I. 77 at 14; D.I. 94 at 15).

On March 24, 2020, while Plaintiff's appeal was pending, Provost Morgan announced, "All probationary TT [tenure-track] faculty and CT faculty (i.e. all who are in their first 6 years) are granted a one-year extension to the tenure/contract clock." (D.I. 94 at 16 (quoting D.I. 80-1 at 425–26 of 464)). Defendant did not grant this extension to Plaintiff and terminated her employment on August 31, 2021. (*Id.*).

Plaintiff filed the Second Amended Complaint on June 6, 2023, alleging sex discrimination under Title VII and the Delaware Discrimination in Employment Act ("DDEA"); gender discrimination under Title IX; retaliation under Title VII, Title IX, the DDEA, and the Equal Pay Act ("EPA"); discrimination based on family responsibilities under the DDEA; discrimination based on marital status under the DDEA; violations of the EPA; and breach of contract. (*See generally* D.I. 44).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont*

4

*v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011).  "[A] dispute about a material fact is 'genuine'
if the evidence is sufficient to permit a reasonable jury to return a verdict for the non-moving
party."  *Id.*  The burden on the moving party may be discharged by pointing out to the district
court that there is an absence of evidence supporting the non-moving party's case.  *Celotex*, 477
U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue
for trial.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986);
*Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989).  A non-moving party
asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to
particular parts of materials in the record, including depositions, documents, electronically stored
information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or
other materials; or (B) showing that the materials cited [by the opposing party] do not establish
the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P. 56(c)(1).  The non-moving party's
evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the
court) than a preponderance."  *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view
the evidence in the light most favorable to the non-moving party and draw all reasonable
inferences in that party's favor.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*,
476 F.3d 180, 184 (3d Cir. 2007).  If the non-moving party fails to make a sufficient showing on
an essential element of its case with respect to which it has the burden of proof, the moving party
is entitled to judgment as a matter of law.  *See Celotex Corp.*, 477 U.S. at 322.

### III.   DISCUSSION

The parties cross-move for summary judgment on Plaintiff's breach of contract claims. Defendant also moves for summary judgment on Plaintiff's discrimination and retaliation claims. Defendant further moves for summary judgment on damages, arguing that Plaintiff cannot recover back pay damages above $59,000, any front pay damages, or any tuition-related damages.

#### A.  Cross-Motions on Breach of Contract

Plaintiff alleges Defendant breached her employment contract by "escalating" the research standard applied during her tenure review process and by denying her a one-year contract extension.  To establish a claim for breach of contract, Plaintiff must show: (1) the existence of a contract; (2) the breach of an obligation imposed by the contract; and (3) damages. *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003).

#### 1.  "Escalation" of Research Standards

Section 4.4.13 of Defendant's Faculty Handbook states, "Those faculty who are candidates for promotion and/or tenure during the probationary period prior to the granting of tenure have the right to be reviewed under the policy and procedure in force at the time of hiring, rather than under any revised policy or procedure subsequently adopted." (D.I. 80-1 at 25–26 of 464).[3]  The 2006 criteria—the departmental standard in place at the time of Plaintiff's hiring—state:

> To be rated as excellent in research, a candidate must have established a
> respected, quality research program.  This program should be evidenced by

---

[3] I previously found that Plaintiff's employment contract incorporates the Faculty Handbook by reference. (*See* D.I. 17 at 14–15).  The contract thus includes the rights and obligations set forth in the Faculty Handbook. (*Id.*).  At oral argument, Defendant conceded for the purpose of the present motions that the 2006 criteria are part of the contract. (Hearing Tr. at 28:18–23).

publications in recognized quality and highly regarded refereed journals. The candidate's research should have received favorable review by recognized scholars from other Universities and provide unmistakable promise of continuing scholarly productivity.

(*Id.* at 80 at 464).

Plaintiff contends that Defendant breached its employment contract with her "[b]y failing to adhere to the policies regarding research standards for [Plaintiff]'s tenure and promotion evaluation." (D.I. 44 ¶ 305). The 2006 criteria, Plaintiff argues, did not require premier publications to establish excellence in research; they only required publications in "a respected, quality research program." (D.I. 94 at 17).

Defendant argues it did not escalate its research standards during Plaintiff's tenure review because "[t]he standard has been 'excellence' since at least 1988." (D.I. 77 at 35–36). The 2006 criteria, Defendant contends, give faculty members and administrators "significant discretion" in the review of candidates for tenure. (*Id.* at 36). Defendant contends that faculty and administrators exercised this discretion when they determined that Plaintiff had failed to achieve excellence in research. (*Id.* at 37–38).[4]

I agree with Defendant that Plaintiff cannot establish Provost Morgan breached the Faculty Handbook on behalf of Defendant when she denied Plaintiff's tenure application. The 2006 criteria state that a candidate for tenure can establish excellence in research through "a respected, quality research program." (D.I. 80-1 at 80 of 464). The plain language of the criteria indicates that reviewers should consider three components when deciding whether a candidate has established such a program: (1) "publications in recognized quality and highly regarded

_____

[4] Plaintiff contends that Provost Morgan's discretion was "not unbounded." (D.I. 94 at 21; *see also* Hearing Tr. at 23:11–16 ("The standards don't defer to them. They defer to the standards. There's no language in the '06 standards that give them the kind of unfettered discretion that they want.")).

refereed journals," (2) "favorable review by recognized scholars from other Universities," and (3) "unmistakable promise of continuing scholarly productivity." (*Id.*). Although the criteria set forth a procedure, this language ultimately contemplates that decisionmakers like Provost Morgan will exercise their judgment in making tenure decisions.

I am unpersuaded by Plaintiff's argument that Defendant improperly considered her lack of publication in premier journals. Plaintiff cites to a departmental list, which classifies journals as "premier," "top tier," "respected," and "professional." (*See* D.I. 77-1 at 641–45 of 787). She argues that the use of the word "respected" in the 2006 criteria's phrase "respected, quality research program" means candidates satisfied the "respected, quality research program" criteria if they only published in journals in the "respected" category on this list. (*See, e.g.*, Hearing Tr. at 25:12–24). Perhaps a different way of phrasing the argument would be that a candidate could not be found not to be "excellent in research" on the basis of the quality of the journals in which she published so long as the journal was in at least the "respected" journal category. The journal list is, at best, extrinsic evidence.[5] I do not consider it because I do not think that the 2006 criteria are ambiguous. *See Cox Commc'ns, Inc. v. T-Mobile US, Inc.*, 273 A.3d 752, 760 (Del. 2022) ("We do not consider extrinsic evidence unless we find that the text is ambiguous.").

Even if the journal list were considered, however, the 2006 criteria use the words "respected" and "quality" in connection with a candidate's entire research program, not to describe individual journals. The plain language indicates that the research program is not limited to publications only; external reviews and the unmistakable promise of continuing scholarly productivity are part of the program, too. The 2006 criteria, when describing journals,

---

[5] I note that the list was adopted in October 2015, years after the 2006 criteria were written. (*See* D.I. 77-1 at 641 of 787).

merely state that candidates should publish in "recognized quality and highly regarded refereed journals." That is not the same as expecting publication in journals named in a later-promulgated "respected" list.

Provost Morgan's testimony also indicates that the review of a candidate's tenure application goes beyond looking at which journals published their scholarship. She testified, "Articles, even in premier journals, vary in terms of quality. So it's not just where it's published; it's, is it cited, did it matter?" (D.I. 77-1 at 193 of 787 (deposition transcript at 136:1–5)). The review process thus considers the impact of an article after publication. Such an evaluation requires administrators to apply their judgment.

Provost Morgan's determination of what constitutes "favorable review" by external reviewers required judgment, too. In the initial letter denying tenure, she wrote, "The input of several external reviewers also factored into my decision." (D.I. 80-1 at 391 of 464). At her deposition, Provost Morgan testified that the reviews were, in the aggregate, lukewarm and measured. (D.I. 77-1 at 175 of 787 (deposition transcript at 64:16–19)).

One reviewer opined that Plaintiff's publications were "at or near the threshold for promotion to associate professor at schools similar to the University of Delaware in terms of overall research productivity." (D.I. 80-1 at 301–02 of 464). Provost Morgan testified, "'At or near'" is a bit troubling for me. Near is—it needs to be at or above. Near is worrisome. That would be the kind of thing I would call measured." (D.I. 77-1 at 177 of 787 (deposition transcript at 72:14–17)).

Another reviewer opined that she "would expect that [Plaintiff's] publication record will improve substantially in the next year or two." (D.I. 80-1 at 298 of 464). Provost Morgan testified that the words "expect it to improve" were measured. (*See* D.I. 77-1 at 179 of 787

(deposition transcript at 79:14–16); *id.* at 221 of 787 (deposition transcript at 249:17–250:2) ("That's not a stellar statement. It means, let's just give her more time. It will improve. That's not a good letter. That's not a good statement to have in there. It doesn't make me confident that the record was excellent or extraordinary.")).

A third reviewer opined, "Given the relatively low frequency with which these top journals publish experimental tax research, it is not surprising that Professor Vermeer has no publications among this set of journals." (D.I. 80-1 at 310 of 464). Provost Morgan testified that the letter had a "lukewarm tenor" because "it is justified—there's justification in this letter for a record." (D.I. 77-1 at 181 of 787 (deposition transcript at 88:18–24)). She believed other letters were "strong" or "an endorsement." (*Id.* at 176 of 787 (deposition transcript at 66:23–67:1); *id.* at 183 of 787 (deposition transcript at 95:18–20)).

These external reviewers' comments are subject to interpretation, and I do not think that Plaintiff can establish a breach by arguing that Provost Morgan should have viewed the letters in a more positive light.

The final component of the excellence criteria, "unmistakable promise of continuing scholarly productivity," requires judgment as well. Although Provost Morgan's tenure denial letter did not explicitly address this language, the letter stated that she agreed with the assessments of the department committee, the department chair, and Dean Weber. (D.I. 80-1 at 391 of 464).[6] Provost Morgan also testified about this language at her deposition. She said,

> [A] tenure decision should not be something that one is flipping a coin over. It's not a roll of the dice. There needs to be unmistakable evidence that the individual has achieved excellence in that primary area of responsibility and will continue to do so. I did not see that evidence.

---

[6] For instance, Levine, the department chair, discussed the "unmistakable promise" language in her assessment of Plaintiff's tenure application. (*See* D.I. 80-1 at 336 of 464).

(D.I. 77-1 at 220 of 787 (deposition transcript at 242:14–21)). The "unmistakable promise of continuing scholarly productivity" requires prediction and is too subjective to support Plaintiff's claim.

I thus conclude Plaintiff cannot establish that Defendant through Provost Morgan's decision breached the Faculty Handbook. Defendant followed its procedure in evaluating Plaintiff's candidacy for tenure, and Provost Morgan made judgment calls to determine whether Plaintiff had achieved excellence in research. Defendant's subjective determinations in this process are "beyond the competence of individual judges." *See Kunda v. Muhlenberg Coll.*, 621 F.2d 532, 548 (3d Cir. 1980) (Courts "should not substitute their judgment for that of the college with respect to the qualifications of faculty members for promotion and tenure. Determinations about such matters as . . . research scholarship . . . are subjective, and unless they [are a] mechanism to obscure discrimination, they must be left for evaluation by the professionals . . . .").

I therefore grant Defendant's summary judgment motion with respect to the breach of contract claim on escalation of research standards. I deny Plaintiff's motion on this issue.

### 2. One-Year Contract Extension

In March 2020, Defendant announced, "All probationary TT [tenure-track] and CT faculty (i.e. all who are in their first 6 years) are granted a one-year extension to the tenure/contract clock." (D.I. 80-1 at 425 of 464). Defendant later amended the Faculty Handbook to include this language. (*See id.* at 28–29 of 464). The parties dispute whether

Plaintiff was entitled to the one-year contract extension. Plaintiff contends that Defendant breached her employment contract by not granting it to her.[7]

Defendant argues the extension did not apply to Plaintiff because it only covered faculty members who "were still on a tenure clock" and had not yet submitted dossiers for review. (D.I. 77 at 34). Defendant relies on the testimony of Matthew Kinservik, the vice provost for faculty affairs, and Provost Morgan to contend that Plaintiff's tenure clock stopped when she applied for tenure in 2019. (*Id.* at 34–35).[8]

Plaintiff argues she was entitled to the one-year extension based on the plain meaning of the announcement. (D.I. 94 at 22–23). She contends that her probationary period as an assistant professor ran from September 1, 2014, to August 31, 2020, so she was still a tenure-track faculty member as of March 24, 2020. (*Id.*). Plaintiff argues that Defendant seeks to read the words "contract clock" out of the contract. (*Id.* at 23).

Plaintiff also contends that Defendant's position is inconsistent with the testimony of Kinservik and Provost Morgan. Kinservik testified both that the "period of achievement" stops when a dossier is submitted for review, and that faculty members may "submit updates to their dossier." (*Id.* (citations omitted)). Provost Morgan testified both that the extension "wouldn't apply" to faculty who submitted their dossiers in the summer of 2019, and that appeals are an "important part of the process." (*Id.* (citations omitted)). Plaintiff contends that she participated

---

[7] Plaintiff's employment contract with Defendant incorporates the Faculty Handbook by reference.

[8] Defendant also argues that an email from Plaintiff to a union representative proves she knew the extension terms did not apply to her. (D.I. 93 at 14). Plaintiff responds that she sent the email to seek "clarification and support for ensuring" that she would receive the extension. (D.I. 104 at 10 (emphasis omitted)).

in the tenure process until April 30, 2020—after the implementation of the one-year extension. (*Id.* at 24).

I agree with Plaintiff that the plain language of the announcement indicates the one-year contract extension applies to her. In Delaware, contract interpretation is a matter of law. *Rhone–Poulenc Basic Chems. Co. v. Am. Motorists Ins. Co.*, 616 A.2d 1192, 1195 (Del. 1992). A contract should be given its ordinary meaning when the language is clear and unambiguous. *GMG Cap. Invs., LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012). Ambiguity only exists if contractual provisions "are reasonably or fairly susceptible of different interpretations or may have two or more different meanings." *Rhone–Poulenc*, 616 A.2d at 1196. If the text if ambiguous, Delaware courts may consider extrinsic evidence. *See Cox*, 273 A.3d at 761. "The true test is not what the parties to the contract intended it to mean, but what a reasonable person in the position of the parties would have thought it meant." *Rhone–Poulenc*, 616 A.2d at 1196.

I do not think that the language of the contract extension announcement is ambiguous. The announcement is directed to "all who are in their first 6 years." This includes Plaintiff because she began working as an assistant professor in the fall of 2014, so she did not complete her first six years until the fall of 2020. Although Plaintiff had appealed the denial of tenure at the time the one-year contract extension was announced, neither the announcement nor the Faculty Handbook purports to differentiate between faculty members who had already applied for tenure and those who had not. Because the language at issue is not ambiguous, I do not rely on extrinsic evidence.

I grant Plaintiff's summary judgment motion on the one-year contract extension, and I deny Defendant's summary judgment motion on this issue.

### B. Defendant's Remaining Motions

#### 1. Discrimination

Plaintiff alleges that Defendant discriminated against her based on sex and gender when it denied her application for tenure.

Defendant argues that Provost Morgan's tenure decision is entitled to substantial deference. (D.I. 77 at 16–17). Plaintiff, on the other hand, contends that educators who discriminate cannot be given special deference. (D.I. 94 at 24–25). The Third Circuit has held that "academic institutions and decisions are not ipso facto entitled to special treatment under federal laws prohibiting discrimination." *Kunda*, 621 F.2d at 545. I therefore consider Plaintiff's claims under the burden-shifting framework governing Title VII discrimination claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973).

Plaintiff must first establish a prima facie case of the complained-of discrimination. *Id.* at 802. To state a prima facie claim for sex discrimination under Title VII, Plaintiff must allege: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).[9]

Once a prima facie case has been established, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for the alleged adverse employment action. *McDonnell*,

---

[9] The same standard applies for Plaintiff's sex discrimination claims under Title IX and the DDEA. *See Doe v. Univ. of Scis.*, 961 F.3d 203, 209 (3d Cir. 2020) ("[T]o state a claim under Title IX, the alleged facts, if true, must support a plausible inference that a federally-funded college or university discriminated against a person on the basis of sex."); *Hyland v. Smyrna Sch. Dist.*, 608 F. App'x 79, 83 n.5 (3d Cir. 2015) ("[T]he standards under Title VII and the DDEA are generally the same . . . .").

411 U.S. at 802–03. After Defendant proffers a reason for the action, the burden shifts back to Plaintiff to establish that Defendant's articulated rationale is pretext. *Id.* at 804. "To avoid summary judgment, the plaintiff's evidence rebutting the employer's proffered legitimate reasons must allow a factfinder reasonably to infer that each of the employer's proffered non-discriminatory reasons was either a post hoc fabrication or otherwise did not actually motivate the employment action." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994) (cleaned up).

### a. Prima Facie Case

Defendant's briefing focuses on the last element of Plaintiff's discrimination claim: whether she was denied tenure under circumstances that give rise to an inference of intentional discrimination.

To support an inference of intentional discrimination, Plaintiff can show that similarly situated employees outside her protected class were treated more favorably. "[T]o be considered similarly situated, comparator employees must be similarly situated in all relevant respects." *Wilcher v. Postmaster Gen.*, 441 F. App'x 879, 882 (3d Cir. 2011); *see also Perano v. Township of Tilden*, 423 F. App'x 234, 238 (3d Cir. 2011) (quoting *Startzell v. City of Philadelphia*, 533 F.3d 183, 203 (3d Cir. 2008)). To determine whether employees are similarly situated, courts should consider relevant factors, which may include the employees' job responsibilities, the supervisors and decisionmakers, whether the employees were subject to the same standards, and the nature of the misconduct. *Wilcher*, 441 F. App'x at 882; *Opsatnik v. Norfolk S. Corp.*, 335 F. App'x 220, 223 (3d Cir. 2009).

Plaintiff contends that three male faculty members—Tom Vermeer, Brian Greenstein, and David Jenkins—are similarly situated as her. (D.I. 94 at 25–26). She argues they are

comparators because they were all members of her department and sought tenure under the same criteria, and in a similar time period, as her. (*Id.* at 28).

Defendant contends that none of the men are similarly situated. (D.I. 77 at 17–18). Tom Vermeer, unlike Plaintiff, worked at several colleges before Defendant hired him, published significantly more articles than Plaintiff, and taught a heavier course load. (*Id.* at 18). Greenstein was hired as an associate professor with tenure, so Defendant contends that he did not participate in the same process as Plaintiff. (*Id.* at 19). Defendant also contends that Jenkins is not comparable to Plaintiff because he was evaluated under the 1999, not the 2006, criteria. (*Id.*). Jenkins published more articles than Plaintiff and taught a heavier course load. (*Id.* at 20).[10] Defendant further notes that Plaintiff was evaluated by different reviewers than Tom Vermeer, Greenstein, and Jenkins. (*Id.* at 18–20).

Plaintiff argues that research quality is "central" to the comparator analysis. (D.I. 94 at 26). She contends that differences in the identities of reviewers are "distinctions without a difference." (*Id.*). Plaintiff similarly argues that focusing on the quantity of published articles is a "red herring." (*Id.*). Although Greenstein was hired as an associate professor with tenure, Plaintiff contends that he was evaluated under the same criteria as her. (*Id.* at 27).[11] She further argues that Jenkins was evaluated under the 2006, not the 1999, criteria. (*Id.*).[12] Because Tom

---

[10] Defendant also argues that "remarks purportedly made by one member of the thirteen-member Department Committee more than four years prior to the Committee's recommendation" regarding tenure are insufficient to establish Plaintiff's prima facie case. (D.I. 77 at 17). Plaintiff does not respond to this point in her answering brief. (*See generally* D.I. 94 at 24–28).

[11] Defendant replies that professors hired with tenure are not required to meet the same standard as professors who go up for tenure. (D.I. 103 at 8 n.11).

[12] Defendant disputes this by citing to the deposition testimony of Levine, the department chair, and to Jenkins's tenure file. (D.I. 103 at 9 n.12).

Vermeer, Greenstein, and Jenkins received tenure, Plaintiff argues that the difference in Defendant's treatment of her and these three men supports an inference of intentional discrimination.

I do not think that Plaintiff's claim fails merely because different people evaluated the tenure applications in question. Conflicting decisions from other circuits indicate that differences between the identities of decisionmakers are not necessarily fatal to discrimination claims. *Compare Maras v. Curators of Univ. of Mo.*, 983 F.3d 1023, 1029 (8th Cir. 2020) ("[T]he comparators Maras points to are not similarly situated in all relevant respects to Maras. The ultimate decisionmaker, Chancellor Loftin, did not review any of the comparators' applications. One comparator was in a completely different department. . . ."), *with Martin v. Auburn Univ. Montgomery*, 908 F. Supp. 2d 1259, 1269 (M.D. Ala. 2012) ("[S]ome of the comparators . . . are similar to him even though they were not in the same Department. . . . [A]lthough the tenure recommendations originated with different departments, they were reviewed by the same University committee, and all subsequent decision makers.").

I agree with Defendant, however, that Tom Vermeer and Greenstein are not comparators for the purpose of Plaintiff's discrimination claims. Tom Vermeer began working for Defendant as an associate professor without tenure in 2009. He went up for tenure in 2012. (*See* D.I. 77-1 at 360 of 787 (deposition transcript at 174:11–175:10); *id.* at 774 of 787). Greenstein, meanwhile, began working for Defendant in 2009 as an associate professor with tenure. (*See* D.I. 77-2 at 8–9 of 160 (deposition transcript at 16:13–17:1)). Both Tom Vermeer and Greenstein had earned tenure at different universities prior to working for Defendant. (*See* D.I. 77-1 at 360 of 787 (deposition transcript at 174:23–175:10); D.I. 77-2 at 8 of 160 (deposition transcript at 15:21–16:1). Plaintiff, on the other hand, was an assistant professor who, in 2019,

went up for tenure and a promotion to associate professor for the first time. (D.I. 94 at 2–3, 8). Due to the differences in rank between Plaintiff and these men, Tom Vermeer and Greenstein are not comparators in all relevant respects. *See Abuelyaman v. Ill. State Univ.*, 667 F.3d 800, 811 (7th Cir. 2011) ("[D]espite the use of uniform evaluation criteria, distinctions between ranking levels matter significantly because those distinctions show that professors of different ranks are not evaluated under the same standards, and that such professors most likely do not have comparable experience, education, and other qualifications.").

As to whether Jenkins is a comparator, the evidence presents a genuine dispute of material fact. Jenkins and Plaintiff both worked for Defendant as tenure-track assistant professors. (D.I. 77 at 5, 9). They had similar publication records prior to applying for tenure. Jenkins published ten articles (D.I. 77 at 9), while Plaintiff published seven (*see* D.I. 79 at 7). The parties dispute, however, whether Jenkins was evaluated under the 2006 criteria. Defendant relies on Jenkins's tenure file, which does not explicitly state that he chose to be evaluated by the 1999 criteria. Administrators' letters in the file merely include language that mirrors the 1999 criteria. (*See* D.I. 77-2 at 41 of 160; *id.* at 55 of 160).[13] Plaintiff, on the other hand, contends that Jenkins needed to elect the 1999 criteria to avoid being evaluated under the 2006 criteria, which were in place when he submitted his dossier, but that he did not make an election. (Hearing Tr. at 103:13–20). Plaintiff also relies on an affidavit from Tom Vermeer, who states that Jenkins told him he "chose to proceed under the new 2006 Standards." (D.I. 83 ¶ 26).[14]  I

---

[13] I also note that Levine's testimony (*see* D.I. 77-1 at 522–23 of 787 (deposition transcript at 165:3–166:16)) relies on past documents instead of first-hand knowledge, as she began working for Defendant in 2018—years after Jenkins received tenure (*see id.* at 487 of 787 (deposition transcript at 22:3–9); *see also* Hearing Tr. at 59:3–7).

[14] Although these statements are hearsay, they may be considered at the summary judgment stage because they are "capable of being admissible at trial." *Fraternal Ord. of Police,*

think the evidence creates a genuine dispute of material fact as to whether Jenkins was evaluated under the 2006 criteria. This raises a question as to whether Jenkins is a comparator.

Viewing the evidence in the light most favorable to Plaintiff, there is sufficient evidence from which a jury could conclude that Plaintiff has established a prima facie case of discrimination.

### b. Proffered Non-Discriminatory Rationale

Defendant argues that even if Plaintiff can establish a prima facie case of discrimination, her claim fails because Provost Morgan has a legitimate, non-discriminatory reason to deny tenure: failure to achieve excellence in research. (D.I. 77 at 22–23). Plaintiff does not dispute this portion of Defendant's argument. (*See generally* D.I. 94 at 24–30). I therefore turn to pretext.

### c. Pretext

Defendant argues Plaintiff cannot show that Provost Morgan's reasoning for denying tenure was "obviously unsupported." (D.I. 77 at 24). Defendant contends that Plaintiff, prior to applying for tenure, received "ample advice and prior notice" to seek publication in "top quality journals." (*Id.*). Defendant contends she failed to do so. (*Id.*). After Plaintiff submitted her dossier, eight members of the department committee, the department's chair, three members of the College Committee, Dean Weber, and Provost Morgan all concluded that she had not

---

*Lodge 1 v. City of Camden*, 842 F.3d 231, 238 (3d Cir. 2016) (citation omitted). Plaintiff has identified Jenkins as the third-party declarant, and neither party has suggested that Jenkins will be unavailable to testify at trial. *See id.* at 239 ("Here, Plaintiffs identified the third-party declarants, and nothing suggests that those declarants would be unavailable to testify at trial. That is all that was required to survive that aspect of Defendants' motion for summary judgment.").

achieved excellence in research. (*Id.*). Defendant thus argues Plaintiff has failed to establish that discrimination was the real reason for Provost Morgan's decision. (*Id.* at 25).

Plaintiff contends that there is a genuine dispute of material fact as to pretext. (D.I. 94 at 28). She argues that evidence of disparate treatment between her and similarly situated male faculty members is sufficient to satisfy her burden at this stage. (*Id.*).[15]

Viewing the evidence in the light most favorable to Plaintiff, I agree with her that there is a genuine dispute of material fact as to pretext. To establish that Defendant's proffered rationale for the termination was pretextual, Plaintiff may point to such "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them 'unworthy of credence.'" *Fuentes*, 32 F.3d at 765 (citation omitted). Plaintiff may also show that Defendant has treated similarly situated people not within the protected class more favorably. *Fuentes*, 32 F.3d at 765. Because there is sufficient evidence from which a jury could conclude that Jenkins is a comparator who was treated more favorably than Plaintiff, I deny Defendant's motion for summary judgment with respect to the discrimination claims.

### 2. Retaliation

Plaintiff claims that Defendant retaliated against her in violation of Title VII, which prohibits an employer from discriminating against an employee "because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or

---

[15] Plaintiff lists various other reasons to support her pretext argument, including alleged violations of the Faculty Handbook, failure to recuse during the voting process, and the "burying" of discrimination complaints. (D.I. 94 at 29). In light of my reasoning, I do not need to resolve this portion of the parties' dispute on pretext.

hearing under this subchapter." 42 U.S.C. § 2000e-3(a). Defendant moves for summary judgment on the retaliation claims.

Title VII retaliation claims, like discrimination claims, are governed by the *McDonnell Douglas* framework. *McDonnell*, 411 U.S. at 802–05. To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse"; and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006). Once a prima facie case has been established, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for the alleged adverse employment action. *McDonnell*, 411 U.S. at 802–03. After the employer proffers a reason for the action, the burden shifts back to the plaintiff to establish that the employer's articulated rationale is pretext. *Id.* at 804.

Defendant contends that Plaintiff cannot establish a prima facie case of retaliation because she has not engaged in activity protected under Title VII. Defendant also argues that the alleged retaliatory acts are not causally connected to any protected activity.

### a. Prima Facie Case

Defendant argues that Plaintiff's retaliation claims were previously dismissed with prejudice and cannot be re-pled; Defendant also argues that the claims are time-barred. (D.I. 77 at 25–27). In response, Plaintiff contends that her amended retaliation claims relate back to her original complaint and are proper under Federal Rule of Civil Procedure 54(b). (D.I. 94 at 30). Defendant concedes this point in its reply brief and states it is withdrawing its motion to dismiss.

21

(D.I. 103 at 1 n.2).  Because Defendant has forfeited its arguments about re-pleading and timeliness, I consider the retaliation claims on the merits.

### i.   Protected Activity

Defendant argues that Plaintiff's January 2020 appeal to Provost Morgan does not rise to the level of protected activity under Title VII.  (D.I. 77 at 28 n.19).  Defendant contends that Plaintiff's purported complaints are vague and conclusory.  (*Id.*; *see also* Hearing Tr. at 75:24–76:10).  Defendant also argues that Provost Morgan was unaware of any complaints until after she denied Plaintiff's tenure application.  (D.I. 77 at 28 n.19).

Plaintiff contends that her discrimination complaints to multiple administrators put Defendant on notice, and that Provost Morgan would have "considered" those complaints during her "thorough review" of Plaintiff's dossier.  (D.I. 94 at 32).  Plaintiff argues she voiced concerns throughout the tenure process about differential treatment.  (*Id.* at 33).  She also contends that discrimination complaints do not require any particular "magic words."  (*Id.*).

Under the anti-retaliation provision of Title VII, "protected activity" includes participation in certain proceedings and opposition to discrimination made unlawful by Title VII.  *Moore*, 461 F.3d at 341.  In order for the activity opposing discrimination to be protected, "the employee must hold an objectively reasonable belief, in good faith, that the activity [she] oppose[s] is unlawful under Title VII."  *Id.*

An employee's allegations cannot be vague.  "A general complaint of unfair treatment is insufficient to establish protected activity under Title VII."  *Curay-Cramer v. Ursuline Acad. of Wilmington, Del., Inc.*, 450 F.3d 130, 135 (3d Cir. 2006).  Title VII nevertheless sets a "low bar" for filing a facially valid retaliation complaint, as "[a] plaintiff need only allege discrimination

22

on the basis of race, color, religion, sex, or national origin to be protected from retaliatory

discharge under Title VII." *Slagle v. County of Clarion*, 435 F.3d 262, 268 (3d Cir. 2006).

At oral argument, the parties named various documents that were included in Plaintiff's

dossier. (*See* Hearing Tr. at 124:7–20 (letter to department chair); *id.* at 124:21–24 (letter to

College Committee); *id.* at 72:16–25 (appeal to Dean Weber); *id.* at 73:1–21 (letter to University

Committee)). I set forth the relevant portions of these documents:

> Two of these male accounting faculty (Dave Jenkins and Thomas Vermeer)
> earned the unanimous support of the Department P&T Committee, unanimous
> support of the Department Chair, and unanimous support through the entire P&T
> process at the University of Delaware applying the same 2006 P&T Document
> while neither of these two male accounting faculty had a premier publication. So,
> what is different in my case? Why are the 2006 P&T Standards now requiring a
> premier publication for tenure and promotion for me when they did not for these
> two male accounting faculty?

(D.I. 77-2 at 89 of 160) (emphasis omitted) (letter to department chair).

> [M]y research standard is evidenced by the fact that two male accounting faculty
> who earned tenure under the same 2006 P&T standard did not have a premier
> publication. . . . I am unclear why my case is being treated differently and why my
> research standard is being unfairly escalated as compared with these two male
> accounting faculty members.

(*Id.* at 104–05 of 160) (emphasis omitted) (letter to College Committee)).

> Why are my six external letters being ignored and discredited throughout my
> tenure process when the letters of these two male accounting faculty are being
> used copiously to support their applications for tenure and promotion?

(*Id.* at 105 of 160).

> [T]wo male accounting faculty earned the unanimous support of all levels of the
> promotion and tenure process and earned tenure, under the same governing P&T
> standards, in 2008 (Dr. David Jenkins) and 2012 (Dr. Thomas Vermeer) without
> any publications or submissions above the same *top-tier* category on the Journal
> List. So, why were these two male colleagues unanimously supported for tenure
> and promotion, under the same governing P&T standards and with the same (or
> lower) level of publications, while I am not being supported? Whether intentional
> or not, the gender bias is clear.

> Respectfully, this bias is confirmed by your own evaluation of a male accounting colleague, as that colleague (Dr. Thomas Vermeer) earned your unanimous and positive support and earned promotion and tenure in 2012, under the same governing P&T standards.

(D.I. 77-1 at 781 of 787 (appeal to Dean Weber)).

> I have provided evidence from two male faculty, Dr. Dave Jenkins and Dr. Thomas Vermeer, who earned tenure at UD (2008 & 2012, respectively) under the same exact standards without any top three or top six publications and with research record quality equivalent or lower than mine. Why was this not a requirement for these two male faculty earning tenure and promotion and the unanimous support of every level of the process under the exact same P&T Standards, but now a requirement for me?

(D.I. 98-1 at 218 of 452 (letter to University Committee)).

Viewing the evidence in the light most favorable to Plaintiff, I think these statements are sufficient for Plaintiff to establish that she engaged in protected activity prior to the denial of tenure. The statements allege gender discrimination and are not too vague. *Compare Curay-Cramer*, 450 F.3d at 135 (finding that a letter "was too vague to constitute opposition to an unlawful employment practice of his employer because it neither 'explicitly or implicitly' alleged that a protected characteristic was the basis for the adverse employment action"), *with id.* at 135–36 (citing the Ninth Circuit, which held an "employee engaged in protected activity by issuing a letter accusing his employer of 'racism' and 'discrimination'"). I thus turn to the remaining elements of the prima facie claim for retaliation.

### ii. Adverse Action and Materiality

The parties do not dispute that the relevant adverse action is Provost Morgan's denial of Plaintiff's tenure application. (*See, e.g.*, Hearing Tr. at 57:16–21). The parties also do not dispute whether the denial of tenure was material. I therefore turn to the causation prong.

### iii.    Causation

Defendant argues there is no causal connection between Provost Morgan's decision to

deny Plaintiff tenure and any discrimination complaints.  (D.I. 77 at 28).  Defendant also argues

that Plaintiff's characterization of Provost Morgan as a "cat's paw" controlled by Kinservik fails.

(*Id.* at 29).  Defendant contends there is no evidence that Kinservik had a retaliatory motive.  (*Id.*

at 30–31).  Defendant instead contends that Provost Morgan made an informed and independent

decision.  (*Id.* at 31–32).

Plaintiff argues Provost Morgan was aware of, and ignored, the discrimination

complaints when she made her initial decision to deny tenure.  (D.I. 94 at 34).  Plaintiff does not

cite to any evidence showing Provost Morgan knew about the complaints; she instead argues that

the Provost would have reviewed each of Plaintiff's complaints if she indeed reviewed the

dossier "thoroughly."  (*Id.*).  Plaintiff also contends that "a mere month" passed between the

submission of Plaintiff's dossier to Provost Morgan and the Provost's initial decision.  (*Id.*).

Even if Provost Morgan did not know about Plaintiff's complaints, Plaintiff argues that

the cat's paw doctrine applies because Kinservik, "to protect his friends," "buried [Plaintiff's]

complaints and authored key communications that [Provost] Morgan relied on in denying"

tenure.  (*Id.* at 35).  Plaintiff argues Provost Morgan was not "thoroughly informed" in making

her decision and instead relied on others' views.  (*Id.* at 37).  Plaintiff thus contends there is a

genuine dispute of material fact as to whether Kinservik and Dean Weber harbored a retaliatory

animus that caused Provost Morgan to reject Plaintiff's application for tenure.  (*Id.* at 35).

The parties present a genuine dispute of material fact as to whether Provost Morgan knew

about Plaintiff's discrimination complaints prior to deciding.  To show causation, there must be

evidence that the decisionmaker knew of the protected activity.  *See Selvato v. SEPTA*, 658 F.

App'x 52, 56 (3d Cir. 2016). Plaintiff may demonstrate causation through a broad array of evidence, such as "an employer's inconsistent explanation for taking an adverse employment action, a pattern of antagonism, or temporal proximity unusually suggestive of retaliatory motive." *Carvalho-Grevious v. Del. State Univ.*, 851 F.3d 249, 260 (3d Cir. 2017) (cleaned up). Where there is no evidence that the decisionmaker knew of the protected activity, and there is no temporal proximity between the plaintiff's protected activity and the employer's allegedly retaliatory response, there is no causation. *Clark Cnty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001).

Provost Morgan, the final decisionmaker, testified she did not know prior to deciding Plaintiff's tenure application that Plaintiff had filed discrimination complaints. (*See, e.g.*, D.I. 77-1 at 184 of 787 (citing deposition transcript at 98:14–99:4)). Provost Morgan testified she only found out about Plaintiff's complaints after Plaintiff appealed the tenure denial. (*Id.* at 200 of 787 (citing deposition transcript 165:4–20)). On the other hand, Provost Morgan testified that she "carefully" reviewed Plaintiff's tenure dossier. (*See, e.g.*, *id.* at 167 of 787 (citing deposition transcript at 31:9–18) ("I looked carefully at the documentation that she had . . . ."); *id.* at 213 of 787 (citing deposition transcript at 216:9–10) ("I looked at all of the dossier.")). Because various documents in the dossier include statements that constitute protected activity under Title VII, a jury could infer that Provost Morgan's thorough review of the dossier put her on notice of Plaintiff's discrimination complaints.[16]

---

[16] Because I find there is a genuine dispute of material fact regarding causation, I do not need to reach Plaintiff's alternative causation theory under the cat's paw doctrine.

### b. Proffered Non-Discriminatory Rationale

Defendant argues that Provost Morgan had a "plainly legitimate, non-retaliatory reason for denying Plaintiff tenure—failure to achieve research excellence." (D.I. 77 at 33). Plaintiff does not dispute this. (*See generally* D.I. 94 at 32–38). I thus turn to pretext.

### c. Pretext

Defendant argues Plaintiff cannot identify evidence that would allow a jury to disbelieve Provost Morgan's reason for denying her tenure, or evidence that would allow a jury to believe that a retaliatory reason was the but-for cause of the denial. (D.I. 77 at 33).

Plaintiff contends she would have obtained tenure but for her complaints of discrimination and the "escalation" of research standards. (D.I. 94 at 38). Plaintiff argues that retaliation was the real reason for the tenure denial, noting that the College Committee and University Committee recommended granting tenure. (*Id.*).[17]

To survive summary judgment, Plaintiff "must produce 'sufficient evidence to raise a genuine issue of [material] fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action.'" *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 504 (3d Cir. 1997) (citation omitted). Plaintiff may demonstrate pretext by showing "such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for [the asserted] non-discriminatory reasons." *Fuentes*, 32 F.3d at 765 (cleaned up).

---

[17] Plaintiff also contends that the external reviewers' letters support her candidacy for tenure (D.I. 94 at 38), but as explained above, Provost Morgan believed the letters were "measured."

Here, the University Committee unanimously recommended that Plaintiff be granted tenure. (D.I. 77 at 13). Provost Morgan disagreed. (*Id.* at 13–14). Plaintiff relies on the comments of multiple University Committee members to argue that Provost Morgan "made no effort to resolve the disagreement" between her decision and the University Committee's recommendation. (D.I. 79 at 11–12 (quoting one member who stated that Provost Morgan "came making statements rather than asking questions" and another member who stated that Provost Morgan exhibited "a COMPLETE disregard—for rudimentary norms of fairness and due process" in her meeting with the University Committee)). Provost Morgan disputes that she entered the University Committee meeting with a closed mind. (D.I. 77-1 at 173 of 787 (deposition transcript at 55:22–56:21)). She also testified that after reading about Plaintiff's concerns in Plaintiff's appeal letter (*see id.* at 200 of 787 (deposition transcript at 164:3–19) ("[T]his is clearly saying gender discrimination.")), she did not take any steps to investigate whether Plaintiff had been subjected to unfair treatment (*id.* at 164–65 of 787 (deposition transcript at 21:12–22:12); *id.* at 200 of 787 (deposition transcript at 164:3–11)).

Viewing the evidence in the light most favorable to Plaintiff, the evidence could lead a jury to disbelieve that Plaintiff's failure to achieve excellence in research was the true reason for Provost Morgan's decision to deny tenure. The jury could find that Provost Morgan knew about Plaintiff's discrimination complaints, chose not to investigate them, and retaliated by denying her tenure. Because I think the parties present a genuine dispute of material fact as to pretext, I deny Defendant's summary judgment motion with respect to the retaliation claims.

### 3. Damages

Defendant argues that Plaintiff's right to back pay damages was cut off when she began working at the University of South Carolina. Defendant also contends that even if Plaintiff prevails, she is not entitled to any front pay damages or tuition reimbursement.

#### a. Back Pay

Defendant contends that even if Plaintiff prevails, she cannot receive more than $59,000 in back pay damages as a matter of law. (D.I. 77 at 39). Defendant contends that Plaintiff's back pay damages were cut off in fall 2022 when she joined the University of South Carolina and began earning roughly $60,000 more than when she worked for Defendant. (*Id.* at 40; *see also* Hearing Tr. at 85:2–5).[18] Defendant also argues that any damages for the period between Plaintiff leaving Defendant's employment and joining the University of South Carolina should be reduced by the amount she earned while working at Franklin University. (D.I. 77 at 40).

Plaintiff argues she is entitled to back pay and "fulfill[ed] her mitigation duty" by taking an administrative position with lower pay at Franklin University. (D.I. 94 at 38). She contends that back pay is not precluded solely because she currently has a "higher base compensation" than she did when working for Defendant. (*Id.*). Plaintiff also disputes that she earns $60,000 more than before. (D.I. 95 ¶ 77). Her affidavit, which lists purported differences between salaries and benefits at the two universities, states, "Summer research awards are not included because they are possible with both USC and UD, but subject to both performance and budgetary approval . . . ." (*See* D.I. 95-1). Plaintiff's expert similarly contends that Plaintiff would not

---

[18] To calculate a difference of $60,000, Defendant contends the following: Plaintiff's salary was $184,000 through August 2021, she earns $200,000 per year at the University of South Carolina, and the University of South Carolina gives Plaintiff "an additional 22% of her salary as 'summer support.'" (D.I. 77 at 14).

necessarily receive a summer award.  (D.I. 77-2 at 130 of 160 ("Should Dr. Vermeer earn a competitive summer research stipend, her compensation would be increased up to 22% of her salary . . . .")).

I agree with Defendant that back pay damages are cut off when a plaintiff obtains better employment.  "Back pay is designed to make victims of unlawful discrimination whole by restoring them to the position they would have been in absent the discrimination." *Donlin v. Philips Lighting N. Am. Corp.*, 581 F.3d 73, 84 (3d Cir. 2009).  Courts have equitable discretion to award back pay; it is neither "an automatic [n]or [a] mandatory remedy." *Id.*[19]  If a plaintiff secures new employment that is "better or substantially equivalent," *Ford Motor Co. v. EEOC*, 458 U.S. 219, 236 (1982), "the right to damages ends because it is no longer necessary to achieve an equitable purpose," *Donlin*, 581 F.3d at 84.  Employment is substantially equivalent when it involves "virtually identical promotional opportunities, compensation, job responsibilities, and status as the position from which the Title VII claimant has been discriminatorily terminated." *Booker v. Taylor Milk Co.*, 64 F.3d 860, 866 (3d Cir. 1995).

Defendant has failed, however, to establish as a matter of law that Plaintiff's right to back pay was cut off when she began working at the University of South Carolina.  The parties present a genuine dispute of material fact as to whether Plaintiff has found substantially equivalent employment prior to trial.[20]

First, the parties dispute the amount of Plaintiff's income at the University of South Carolina.  Defendant contends that Plaintiff earns $60,000 more than she did when working for

---

[19] Since back pay and front pay are equitable remedies, jury verdicts on those issues are merely advisory. *Donlin*, 581 F.3d at 78 n.1.

[20] Defendant has therefore also failed to establish that Plaintiff, if she prevails, cannot recover more than $59,000.

Defendant; this calculation assumes that she receives an additional 22% of her salary in summer

support. (*See* D.I. 77 at 14, 40). Plaintiff's expert, on the other hand, opines that the stipend is

not guaranteed. (*See* D.I. 77-2 at 130 of 160). Neither party has established whether Plaintiff

has received this stipend.

Second, regardless of the stipend, the parties dispute whether Plaintiff earns more than

she would have if she had continued to work for Defendant. Plaintiff notes that her base salary

for the 2023–24 academic year is $206,000. (*See* D.I. 95-1). Defendant compares Plaintiff's

current income, along with her salary at Franklin University, to the salary she had in August

2021—$184,000. Defendant thus argues that Plaintiff has found better employment. (D.I. 77 at

14). Plaintiff, however, contends that her base salary for the 2023–24 academic year would have

been higher than $206,000 had she kept working for Defendant. (*See* D.I. 95-1 (listing "mean

base salary of untenured comparators" working for Defendant in 2020–21 through 2023–24

years)).

Back pay awards generally consider anticipated pay raises. *See, e.g.*, *Saulpaugh v.

Monroe Cmty. Hosp.*, 4 F.3d 134, 145 (2d Cir. 1993) ("This [back pay] award should therefore

consist of lost salary, including anticipated raises, and fringe benefits."); *Gutzwiller v. Fenik*, 860

F.2d 1317, 1333 (6th Cir. 1988) ("The back pay award should . . . . include the salary, including

any raises, which plaintiff would have received but for the discrimination, as well as sick leave,

vacation pay, pension benefits and other fringe benefits she would have received but for

discrimination."); *Van v. Plant & Field Serv. Corp.*, 672 F. Supp. 1306, 1319 (C.D. Cal. 1987),

*aff'd on other grounds*, 872 F.2d 432 (9th Cir. 1989). Neither party, however, has shown what

raises, if any, Plaintiff could have expected to receive if she had continued to work for

Defendant. Defendant has thus failed to show as a matter of law that Plaintiff's new position is

better or substantially equivalent.[21]  I defer ruling on Plaintiff's right to back pay damages until after hearing the evidence presented at trial.

### b.  Front Pay

Defendant argues that Plaintiff is not entitled to any front pay damages as a matter of law because she accepted higher-paying employment after leaving Defendant's employment.  (D.I. 77 at 39–40).  Plaintiff disagrees and contends that the University of South Carolina's benefits package is "substantially less generous" than Defendant's.  (D.I. 94 at 38).  Defendant disputes that the Plaintiff's current benefits package is "substantially less" than its own.  (D.I. 103 at 19 n.18).  Defendant also contends that "a delta in terms of benefits . . . has nothing to do with front pay."  (Hearing Tr. at 87:3–6).

Given that back pay only compensates a plaintiff "from the time of discrimination until trial," *Donlin*, 581 F.3d at 86, an award of front pay is "appropriate where a victim of employment discrimination will experience a loss of future earnings because he or she cannot be placed in the employment position that was unlawfully denied," *Bartek v. Urban Redevelopment Auth. of Pittsburgh*, 882 F.2d 739, 747 (3d Cir. 1989).  "The award of future lost earnings in Title VII cases is an alternative to the traditional equitable remedy of reinstatement." *Goss v. Exxon Off. Sys. Co.*, 747 F.2d 885, 890 (3d Cir. 1984).

I think Defendant has failed to show as a matter of law that Plaintiff cannot recover any front pay damages.  Defendant mainly relies on *Kardis v. A.C. Nielsen Co.*, 1998 WL 119543 (D.N.J. Mar. 13, 1998).  The district court in *Kardis* found that the plaintiff's new income was commensurate with the amount she would have made if the defendant had not terminated her,

---

[21] If Defendant later shows that Plaintiff's back pay damages were cut off when she accepted a role at the University of South Carolina, and Plaintiff prevails on her claims, she may still be entitled to back pay for the time between termination and the start of her current role.

but the court allowed the plaintiff "to prove that her [new] income did not offset her lost pension benefits." *Id.* at *8. The present case differs from *Kardis* because there is a factual dispute as to whether Plaintiff currently earns more than when she worked for Defendant. Even if her new income were commensurate with her previous salary, though, Defendant has not shown that Plaintiff "found subsequent employment at a greatly increased salary that would offset any loss of pension benefits." *Blum v. Witco Chem. Corp.*, 829 F.2d 367, 373 (3d Cir. 1987). Defendant cites generally to the two benefits packages at issue (*see* D.I. 103 at 19 n.18), but neither party has submitted evidence to establish the value of either package.

I thus cannot find that front pay damages are too speculative as a matter of law. I "defer ruling on whether front pay damages are appropriate, and if so, for what period of time and in what amount, until after hearing the evidence presented at trial." *Savage v. Temple Univ.*, 2022 WL 911153, at *13 (E.D. Pa. Mar. 29, 2022).

### c. Tuition Benefits

Defendant argues that Plaintiff cannot recover any damages related to her children's loss of college tuition benefits. (D.I. 77 at 40). Defendant contends that any tuition-related damages are too speculative and would, if anything, be recoverable by Plaintiff's children, not by her. (*Id.*). To support its argument, Defendant contends that Plaintiff is not legally obligated to pay for her children's college tuition. (D.I. 103 at 20; *see also* Hearing Tr. at 88:7–11). Defendant also disputes whether the children would have been eligible for its tuition reimbursement program. (D.I. 77 at 40).

Plaintiff argues that her children would have been eligible for free tuition at "hundreds of cooperating institutions" if she had continued to work for Defendant. (D.I. 94 at 40; *see also* D.I. 95 ¶ 85 ("UD's tuition program extend[s] beyond UD to hundreds of other colleges and

universities . . . ."); D.I. 77-2 at 141 of 160 (stating that Plaintiff "had tuition benefits available at

UD and at more than 660 tuition exchange member schools nationwide")).  Plaintiff also

contends that the loss of tuition benefits is her loss, not her children's loss.  (D.I. 94 at 40).  Her

expert opines that the University of South Carolina does not provide tuition benefits to Plaintiff.

(D.I. 77-2 at 141 of 160).

 Plaintiff further disputes that lost tuition benefits are too speculative.  (D.I. 94 at 40).  She

contends that her three younger children are "highly likely" to attend college given that their

parents both have doctorates and the eldest child has finished college.  (*Id.*; *see also* D.I. 95 ¶

85).

 Defendant is incorrect in arguing that Plaintiff cannot recover tuition benefits as a matter

of law.  The *Savage* decision does not preclude plaintiffs from recovering tuition benefits that

benefit their children.  The parties have not, however, briefed the issue sufficiently for me to

determine whether Plaintiff's claim for tuition reimbursement is speculative.  Plaintiff, unlike the

parent in *Savage*, contends that Defendant's tuition policy covers hundreds of schools.  (*See* D.I.

77-2 at 141 of 160; D.I. 95 ¶ 85).  She also contends that her children will apply to college (D.I.

95 ¶ 85), and one of them is at least sixteen years old (D.I. 83 ¶ 15).  Defendant, on the other

hand, does not concede that Plaintiff's children would have been eligible for its tuition

reimbursement program.  (D.I. 77 at 40).  Because there is insufficient information for me to

decide this issue now, I defer ruling on tuition reimbursement until after hearing the evidence

presented at trial.

## IV. CONCLUSION

 For the foregoing reasons, Defendant's motion is DENIED with respect to the

discrimination and retaliation claims.  Defendant's motion is DISMISSED without prejudice

with respect to back pay, front pay, and tuition-related damages.  Defendant's motion is

GRANTED with respect to the breach of contract claim on "escalation" of research standards.

Defendant's motion on the contract extension claim is DENIED.

Plaintiff's motion on the research standards issue is DENIED.  Plaintiff's motion on the

one-year contract extension is GRANTED.

An appropriate order will issue.